IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KIM PICKRELL; KEITH HENSLEE; | § | |
| FALLON LAFLEUR; VYKIM LE; JANE DOE 1; | § | |
| and JANE DOE 2, | § | |
| Plaintiffs | § | CIVIL ACTION NO. |
| | § | JURY TRIAL DEMANDED |
| VS. | § | |
| | § | |
| COLLIN COUNTY, TEXAS; GREG WILLIS, | § | |
| Individually; BILL WIRSKYE, Individually; | § | |
| DARRELL HALE, Individually; SUSAN | § | |
| FLETCHER, Individually; CHRIS HILL, | § | |
| Individually; CHERYL WILLIAMS, Individually; | § | |
| and DUNCAN WEBB, Individually | § | |
| Defendants | § | |

**PLAINTIFFS' ORIGINAL COMPLAINT
AND JURY DEMAND**

---

COME NOW Plaintiffs KIM PICKRELL, KEITH HENSLEE, FALLON LAFLEUR,

VYKIM LE, JANE DOE 1, and JANE DOE 2 and file this their Original Complaint against

Defendants COLLIN COUNTY, TEXAS, GREG WILLIS, Individually, BILL WIRSKYE,

Individually, CHRIS HILL, Individually, DARRELL HALE, Individually, SUSAN FLETCHER,

Individually, CHERYL WILLIAMS, Individually and DUNCAN WEBB, Individually, and in

support of their causes of action would respectfully show the following: This is a claim for

employment discrimination, harassment and retaliation pursuant to Title VII of the Civil Rights

Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 ("Title VII"), and the Texas Commission on Human

Rights Act, Texas Labor Code § 21.001 *et seq*. (the "TCHRA"). Title VII and the TCHRA make

it unlawful to discriminate against or harass employees because of their gender as well as to retaliate for opposing or reporting such conduct. The plaintiffs further present this Original Complaint under 42 U.S.C. § 1983, 42 U.S.C. § 1985 sections 2 and 3 and 42 U.S.C. § 1986.

The Collin County District Attorney's Office is supposed to be a principled law enforcement unit that exhibits irreproachable workplace ethics and a steadfast commitment to equal protection under law. Instead, as set forth in the paragraphs below, District Attorney Greg Willis treats many female employees as objects that, without their consent, must gratify his sexual impulses and personal vanity, while First Assistant Bill Wirskye runs the office as a crass, misogynistic fraternity complete with systemic hazing of the County's attorneys, investigators and staff. The Collin County Commissioners, including County Judge Chris Hill have known of this misconduct for years but have continued to enable it by refusing to take remedial action or even conduct a reasonable investigation. Only in recent weeks has the Commissioners Court initiated a review of these charges, but on information and belief, it did so solely for the self-interested purpose of evaluating Collin County's legal liabilities arising from the Commissioners Court's acquiescence to the abuses that Mr. Willis and Mr. Wirskye have committed on the Plaintiffs in this case and to other employees in the District Attorney's Office. Collin County, through its governance by the Collin County Commissioners Court, as well as through its Human Resources Department, aided and abetted the independently elected District Attorney, Greg Willis, and his First Assistant Bill Wirskye (Defendants) to deprive Plaintiffs of equal protection under the law, discriminated against, harassed and retaliated against them for reasons which included, not exhaustively, gender and opposition to their illegal conduct . In furtherance of each Defendant's individual and joint unlawful acts and omissions, the Defendants coerced, censored, and intimidated those with personal knowledge to deter them from exposing Defendants'

unconscionable abuses, and did so in violation of 42 U.S.C. § 1985 and 42 U.S.C § 1986. Defendants' misconduct caused Plaintiffs substantial harm for which Defendants are jointly and severally liable.

## I.   PARTIES

**1.**     Plaintiff Kim Pickrell is a natural person and citizen of the United States, residing in Collin County, Texas.

**2.**     Plaintiff Keith Henslee is a natural person and citizen of the United States, residing in Grayson County.

**3.**     Plaintiff Jane Doe 1 is a citizen of the United States, residing in Collin County.

**4.**     Plaintiff Fallon LaFleur is a citizen of the United States and resides in Collin County.

**5.**     Plaintiff Jane Doe 2 is a citizen of the United States, residing in Collin County.

**6.**     Plaintiff VyKim Le is a citizen of the United States, residing in Dallas County.

**7.**     Defendant Collin County is a governmental entity and may be served with process at 2300 Bloomdale Road, McKinney, Texas.

**8.**     Defendant Greg Willis is the independently elected District Attorney of Collin County and may be served at 2100 Bloomdale Road, McKinney, Texas, or wherever he may be found.

**9.**     Defendant Bill Wirskye is the First Assistant to the Collin County District Attorney and may be served at 2100 Bloomdale Road, McKinney, Texas or wherever he may be found.

**10.**     Defendant Chris Hill is the Collin County Judge who may be served at 2300

Bloomdale Road, McKinney, Texas.

**11.** Defendant Darrell Hale is a Collin County Commissioner who may be served at 2300 Bloomdale Road, McKinney, Texas.

**12.** Defendant Susan Fletcher is a Collin County Commissioner who may be served at 2300 Bloomdale Road, McKinney, Texas.

**13.** Defendant Cheryl Williams is a Collin County Commissioner who may be served at 2300 Bloomdale Road, McKinney, Texas.

**14.** Defendant Duncan Webb is a Collin County Commissioner who may be served at 2300 Bloomdale Road, McKinney, Texas.

## II.    VENUE

**15.** Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b)(2) as a substantial part of the events or omissions given rise to Plaintiffs' claims as detailed above and further below occurred in the Northern District of Texas. Additionally, pursuant to 28 U.S.C. §1391(b)(1) venue is proper in this Judicial District as at least one Defendant, Bill Wirskye, resides in this District at the time of this filing.

## III.    JURISDICTION

**16.** This Court has Jurisdiction pursuant to 28 U.S.C. § 1331. This is a discrimination, harassment and retaliation case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. and the Texas Labor Code. Further, this suit is brought for violations of the constitutional rights of the Plaintiffs by state actors under 42 U.S.C. § 1983, for conspiring to deprive Plaintiffs of the equal protection of the laws in violation of 42 U.S.C. § 1985, and for the conduct of the state actors who knew of § 1985 violations but neglected and refused to prevent

said violations under 42 U.S.C. § 1986.

## IV.  BACKGROUND FACTS

**17.**   As reinforced by Collin County Human Resources, the elected District Attorney is considered "untouchable."  This is not a secret.  The power and authority wielded by the District Attorney is formidable.  This is not just a boss who holds the prosecutors' and investigators' jobs in his hands, DA Willis has the power to destroy careers in criminal law enforcement and to inflict penal resprisal.  He can decide who will be investigated, referred for indictment, and criminally prosecuted.   Such power constrained his victims from exposing his misconduct, or into maintaining anonymity when decrying his abuses, until they could no longer suffer silently.

**18.**   Collin County Government employs more than one thousand employees. The District Attorney is required to represent the State of Texas in county and district courts on criminal matters as well as to work with law enforcement to investigate criminal matters, represent victims of violence in seeking protective orders and finally to represent the state to remove children from abusive households. The employees of the District Attorney are paid by the County whom the District Attorney represents on behalf of the State of Texas. Both the District Attorney, his agents, and Collin County Government are required to provide equal protection under the law and provide protection to employees from discrimination, harassment and retaliation, just as private sector employers are required to provide.

**19.**   The Office of the District Attorney employs several categories of individuals. The Office employs Certified Peace Officers who work exclusively for the District Attorney; they are called Investigators. The Office employs licensed attorneys who represent the State of Texas on behalf of the elected District Attorney; they are called Assistant District Attorneys and are known as "prosecuting attorneys" or "prosecutors." The Office employs support staff such as secretaries

and Victim's Assistance Coordinators, as well as media specialists among others.

**20.** Each Independently Elected Official appoints their own staff. For example, the Collin County Sheriff is Independently Elected and employs hundreds of individuals in various roles. The District Clerk employs a staff of their own, as do the Tax Assessor, the County Clerk and others. The staff are paid by the County.

**21.** Chief Kim Pickrell has worked at the District Attorney's Office since 2006 and has occupied the position of Chief Investigator since 2016. Chief Pickrell reported directly to DA Greg Willis and is still employed at the DA's Office to this day.

**22.** Deputy Chief Keith Henslee has worked at the District Attorney's Office since 2002 and has occupied the position of Deputy Chief Investigator since 2016. Deputy Chief Henslee reported directly to Chief Kim Pickrell and is still employed at the DA's Office to this day.

**23.** Jane Doe 1 began in the District Attorney's Office in 2019 as a receptionist. She continued to work at the Collin County District Attorney's Office in various positions until August 2022.

**24.** Fallon LaFleur began working as a prosecutor in the Collin County District Attorney's Office in 2019. She continued to work as a prosecutor in the District Attorney's Office until 2021.

**25.** Jane Doe 3 began working as a Community Relations Director in 2020 in the Collin County District Attorney's Office. She reported directly to Greg Willis. She continued to work in the District Attorney's Office until 2021.

**26.** VyKim Le began working for the Collin County District Attorney's Office as a prosecutor in 2016. She began reporting directly to Greg Willis in 2019. Despite the abuse

detailed herein she continues to be employed as a prosecutor for the Collin County District Attorney's Office to this day.

27. In November 2010, Defendant Greg Willis was elected to the office of District Attorney (hereinafter referred to as "DA" or "DA Willis"). His first term began on January 3, 2011. DA Willis is married to a sitting District Judge in Collin County.

28. Between 2011 and 2016, Defendant Willis had several First Assistants. The First Assistant is the highest-ranking prosecutor in the office, other than the elected DA. The First Assistant generally handles prosecution of capital murder cases, serious felonies, as well as ultimate supervision of the attorneys in the office and media inquiries. The First Assistant is generally considered the top rank in the attorney "Chain of Command" aside from the DA.

29. The Office of the District Attorney is considered to be law enforcement. The District Attorney represents the State of Texas in criminal matters in Collin County, from the Justice of the Peace level to the District Court level. The prosecutors are appointed and are issued credentials including a card and a badge. Investigators also carry a card and badge. District Attorney's Offices, like other law enforcement, utilize the "Chain of Command" for solving problems and escalating issues.

30. Each state court is assigned a Prosecution Team to represent the State of Texas in criminal matters. Every court has an assigned Chief Prosecutor and generally a "#2 prosecutor" and a "#3 prosecutor." The workload consists of Jury Trials, which are generally set for Mondays and Tuesdays, Bench Trials, which are generally set for Thursdays and Fridays, and docket days which are generally Wednesdays, Thursdays, and Fridays. In addition to the regular court teams, there are special courts that require prosecution staffing. Auxiliary court is one example, which exists to exclusively deal with plea bargains, protective orders and bond hearings.

31.    In addition to the staffing of courts with prosecution teams, each prosecution team is assigned an Investigator. Investigators are Certified Peace Officers, many of whom have prior law enforcement experience. Investigators are required to provide security for the prosecutors and witnesses. They carry a badge and a weapon and are required to secure the attendance of witnesses for Jury Trials, Bench Trials and Evidentiary hearings. Those duties involve making sure the police officers are subpoenaed and appear, making sure civilian witnesses (such as victims of domestic violence) are located, subpoenaed and appear, obtaining records of many types from various private and public entities, and running TLETS searches. Investigators have their own "Chain of Command" in the separate but parallel system to prosecutors. Both ultimately answer to the DA.

32.    In 2016, Defendant Willis hired Defendant Bill Wirskye into the District Attorney's Office as a prosecutor. He was promoted to First Assistant in January 2017. During this time as well as afterwards, Chief Pickrell was reporting directly to Defendant Willis, as well as managing the entire Investigator team, the secretarial staff, and the victim's assistance unit, in addition to managing the Crime Victim's Luncheon and the Tree of Angels events. Chief Pickrell was also the point person on a massive software development project called "Foray." TCOLE training, firearms training budget and payroll were also part of Chief Pickrell's assigned duties. Chief Kim Pickrell is responsible for physical security of the entire District Attorney's Office. Defendant Wirskye oversaw operations for the entire attorney staff of the District Attorney's Office. During this time, the Commissioner's Court was comprised of County Judge Chris Hill, Commissioner Cheryl Williams, Commissioner Duncan Webb, Commissioner Darrell Hale, and Commissioner Susan Fletcher. Cynthia Jacobsen was the Director of Human Resources and Erica Johnson was the Assistant Director.

33.     Once Chief Pickrell began reporting to Defendant Willis, he began to treat her differently from male employees. He made repeated unwanted sexual advances at Chief Pickrell, as well as routine and unwelcome efforts to flirt with her.  In one of her first roles under Defendant Willis, she accompanied him to a Texas District and County Attorney's Association (TDCAA) conference.  As Chief Investigator, Kim Pickrell is Defendant Willis' head of security. At this conference, he requested that Chief Pickrell escort him to a welcome reception along the seawall where the attendees of the conference were socializing upon arrival.  Chief Pickrell believed this request was made to her in her law enforcement capacity and in the performance of her role as a security professional.  Once she delivered Defendant Willis to the welcome reception, she requested permission to briefly leave the reception to call her husband.  After Chief Pickrell asked for that moment to call her husband,  Defendant Willis unexpectedly offered to leave the reception and accompany her to the hotel.  Chief Pickrell was confused by the DA's offer, since he had been at the reception for less than 10 minutes, and she, a security professional, had no need to have to have the DA accompany her.  Then it dawned on her.  DA Willis wanted to be alone with her at the hotel for reasons that were not legitimately job-related.  This incident was only the beginning.

34.     As part of Chief Pickrell's reporting to Defendant Willis, he required exceptionally long meetings on a weekly basis.  These meetings sometimes went on for hours and during the entirety of the meetings, he required his door to remain closed. During these meetings, Defendant Willis sometimes moved from the seat behind his desk to sit next to Chief Pickrell in the seats facing his desk.  This seating arrangement was tight and it caused their knees to touch. On one specific occasion, he "needed help" on an electronic document located on his computer and invited her over to his computer area.  Once she was in place, he began to stroke her hand with

his hand. Quite frequently he would give her full frontal body hugs while pressing her breasts into his chest, rubbing her lower back with his hands and moaning. He'd often remark about the condition of Chief Pickrell's body, saying he could tell that she "worked out." Defendant Willis told Chief Pickrell how good her body looked, and that he just couldn't be around her because she "looked so good." On another occasion, he alluded to his own arousal and said that he couldn't sit next to Chief Pickrell anymore because he couldn't help himself getting excited because she looked too good. On multiple occasions, he told her she was beautiful, and that she had beautiful eyes. During these extended meetings, there were times Defendant Willis refused to discuss business and instead asked personal questions about Chief Pickrell's family life. The harassment and unwanted touching at the computer was typical, but unusual only in that the pretext that there was a business purpose, as he told Chief Pickrell expressly that his motive for these meetings was "personal, not business" to him. When he saw Chief Pickrell in the hallway, he would sometimes ask her to join him in his office. As they walked toward his office, he would position himself to look over her shoulder and down at her breasts. While they walked, with his eyes fixated on Chief Pickrell's breasts, he would literally moan. He would often say in these moments, "I'm sorry you just look too good" and keep moaning. On another occasion, Defendant Willis chose to pull Chief Pickrell into his office from the hall. After doing so, he pulled her body into his, pressing her breasts against his chest. He then leaned toward her with his face in an attempt to kiss her on the mouth. There was no agenda or official County business to discuss; this was simply his way of showing her he could control her and that he would continue to use her as an object for his romantic or sexual desires. Chief Pickrell understood that to keep her position as Chief Investigator, she would be required to tolerate Defendant Willis' sexual advances as part of his quid pro quo, as well as tolerate his abuse when she did not submit to his advances.

35.     Defendant Willis' conduct became more threatening once it was clear to him that Chief Pickrell was not receptive to his sexual advances or his attempts to flirt with her.  He began berating and belittling Chief Pickrell  so frequently that Chief Pickrell never knew what version of Defendant Willis she would get on that day-- he was just as likely to come onto her as he was to scream at her. Notably, Defendant Willis often refused to discuss business with her, choosing instead to play mind-games. Defendant Willis would make Chief Pickrell do "role play" scenarios where he would pretend to be her and he would require her to play the DA. Whereas role play can be a useful management exercise, he used it as a means to groom, flirt, make sexual advances and assert control. During "role play,"  Defendant Willis would berate her for not being able to "read [his] mind." She could read his non-verbal communication that he wanted a sexual interlude with her and he got angry when she never provided him with that answer. His harassment of Chief Pickrell fit a familiar pattern for Defendant Willis: he initiates scenarios and exchanges that he intends to be flirtations from which he draws gratification. He also uses his position of power to force unwanted touching, knowing that even when not reciprocal, the female employee is in no position to rebuff him outwardly. Once he comes to understand that there will be no actual sexual interlude, he is gratified by expressing his anger through acts of intimidation, control, manipulation and retaliation. Defendant Willis also consistently refused to accept personal responsibility for conduct he knew to be sexually harassing and unlawful.  As he would tell it, it was never his fault that he made unwanted sexual advances at Chief Pickrell, but rather *hers*, because she "looked too good" for him to be expected to control his urges. Similarly, he wanted VyKim Le to believe, while he was sexually harassing her, that workplace sexual misconduct was a compulsion for him, rather than a personal choice, because he just "could not  help [him]self" from doing so when near her.

36.     As early as 2017, Chief Pickrell told her Deputy Chief, Keith Henslee about Defendant Willis' consistent abuse of her.  She disclosed that she had not reported the abuse to HR because she was afraid of losing her job and that she always became anxious, nervous and physically sick each time she would be scheduled for a one-on-one meeting with Defendant Willis, who insisted that his opaque frosted door remain closed.

37.     Due to the anxiety, fear and physical anguish Chief Pickrell felt during these closed door meetings, Deputy Chief Henslee would frequently sit in Chief Pickrell's office (which shared a wall with DA Willis' office).  Chief Pickrell and Deputy Chief Henslee developed a plan that in the event a meeting with DA Willis escalated to a level of harassment she could not navigate, she would knock on the wall so Henslee could intervene. These meetings happened regularly. There were many occasions where Chief Pickrell desperately wanted to knock on the wall to signal Henslee that she was in distress, but did not do so, for fear of incurring DA Willis's wrath should he perceive her knock as a cry for help and a joint challenge to his authority.

38.     Defendant Willis' abuse and harassment wasn't limited to Chief Pickrell.  Indeed, Deputy Chief Henslee personally witnessed other instances with a previous Administrative Assistant to Defendant Willis where extreme yelling matches would ensue. On at least one occasion, Defendant Willis threw a backpack in his office at a female staffer, a fact which is known by many in the office. It was common for Deputy Chief Henslee to see women leave Defendant Willis' office in tears.

39.     Between 2017 and 2022, Chief Pickrell was often the confidante for others who were experiencing the erratic and abusive behavior from Defendant Willis.  This behavior at times was sexually charged, like she experienced, while other times were eruptions of DA Willis' fierce rage similar to what she endured.  It was not unusual for women to come into her office and cry-

- tears were routine in the DA's Office. However, crying was expressly prohibited by Defendant Wirskye, which compounded the anguish that Chief Pickrell and others experienced as a result of their interactions with Defendant Willis. Defendant Wirskye enforced his "no crying" policy in prosecutor team meetings whereby he would issue edicts such as "go home if you're gonna cry," "there's no crying in the DA's office," "no snowflakes in this office," "check your emotions at the door," and "nobody gives a shit about your feelings." Given his role and professional relationship with Chief Pickrell, Deputy Chief Henslee witnessed this as well. Deputy Chief Henslee was alarmed by the female employees who were pushed to the point of tears as this had not happened anywhere else during his career in law enforcement and was not objectively normal, professional or acceptable.

40.    The abuse from Defendant Willis was not limited to Chief Pickrell. Jane Doe 1 was hired as a receptionist at the District Attorney's Office in 2019. A few months into that position, Jane Doe 1 became Defendant Willis' Administrative Assistant on a "trial period." Almost immediately, Defendant Willis made unwanted comments about Jane Doe 1's appearance—comments that were inappropriate coming from the elected District Attorney in a professional District Attorney's Office. In addition to these inappropriate comments and full-frontal hugs with moaning, Defendant Willis held the same type of closed-door meetings with Jane Doe 1 as he did with Chief Pickrell, with no one else present in the room. During the "trial period," as part of her job, Jane Doe 1 travelled to a Texas County and District Attorney's Office conference in Galveston. This is the same annual conference hosted by the Texas District and County Attorney's Association (TDCAA) where he had in a prior year harassed Chief Kim Pickrell. After a group dinner, Jane Doe 1 was sitting in the hotel lobby with Defendant Willis while the group dispersed for the evening. During this time, Defendant Willis invited Jane Doe 1 up to his hotel

room, which she politely declined. He changed the subject for a bit, then asked her again if she would come up to his hotel room, saying "I'm not sure where it could lead, but we could explore." Jane Doe 1 replied, "That is not what I am here for."

41.     After Jane Doe 1 refused Defendant Willis' advances at the Galveston TDCAA conference, he treated her quite differently in the workplace. He began demeaning and berating her. In one closed-door meeting he told her, "You think like a child, and I will treat you like a child." Defendant Willis likely appreciated the gender slurring that is implicit in a male supervisor telling a female employee that she "thinks(s) like a child" and shall therefore be treated as one, which makes his misconduct even more violative of personal and public trust. In the same vein, Defendant Willis told Jane Doe 1 that her opinion was "unimportant" and that she must sit in the back of the room during executive meetings, take notes, and say absolutely nothing. Rebuffing his sexual advances put Jane Doe 1 in the proverbial back of the bus. In several other closed-door meetings, both before and after the conference, Defendant Willis would give full body frontal hugs where he pressed her breasts into his body and lingered while moaning. He rubbed her lower back with his hands while her arms were stiffly by her side. More than once, she tried to break free, but he held her tighter. These physical encounters were unwanted and sexual in their nature. Jane Doe 1 eventually put in for a position in the Victim's Assistance Division and got it, in December 2020. This role put her under the supervision of Chief Pickrell, a welcome change. However, the unwanted touching and full frontal hugs with moaning continued--the most recent of these sexualized hugs was April 2022.

42.     Similar to Jane Doe 1, Defendant Willis personally recruited Jane Doe 2 for the Community Engagement Director Position after searching the professional networking website LinkedIn *himself*, going outside the normal hiring methodology. This job paid less than half of

Jane Doe 2's usual rate, but Defendant Willis made representations that he would pay her significantly more. Thereafter, he assured her that he would persuade the Commissioner's Court to create a hybrid position that paid her more appropriately. Jane Doe 2 had a passion for crisis media management and accepted the significantly lower pay to do that work and in reliance on the DA's representations to her that a pay increase would soon be forthcoming.

43.     During Jane Doe 2's tenure with the District Attorney, Defendant Willis conducted his frequent closed-door meetings with her, just like the others.  These meetings with Jane Doe 2 occurred during the COVID pandemic when the office was far less populated. In those meetings and in other office settings, Defendant Willis soon began making sexually suggestive remarks to Jane Doe 2, including "No one rocks those jeans like you." One day, he walked into her office and said, "I thought the heat (from the space heater) was from your hotness." On another day, he walked into her office while she was on the phone. She remarked to the listener on the other end of the phone discussion that she needed to cut the call short because her boss walked in. Defendant Willis heard the remark and then said to Jane Doe 2, "Come on, throw me a bone. Can't you just say that a good-looking guy walked in?" On another specific occasion, Defendants Willis and Wirskye, while in the office and aware of Jane Doe 2's presence, made a smirking remark about the physique of a female model in an apparel catalog. More specifically, Defendant Willis was unable to answer a work-related question posed to him by Jane Doe 2, to which Defendant Wirskye commented that Willis was "distracted" by the model in the catalog.

44.     In addition to the sexually harassing remarks, Defendant Willis often berated Jane Doe 2 when he perceived she was not sufficiently flattering of him. He frequently solicited compliments from her and expressed frustration when he was not praised by Jane Doe 2 and others. He refused to make basic decisions or engage in discussions about actual business,

choosing rather to inflict emotional distress through circular browbeating sessions whereby he would grow angry that Jane Doe 2 could not read his mind. Defendant Willis asked about Jane Doe 2's personal love life, and attempted to invite himself to her home in McKinney. Jane Doe 2 became overwhelmed by Defendant Willis' harassment and abuses of her, and therefore left the DA's office. Defendant Willis' created a highly toxic workplace by targeting female employees to try to flirt with or to direct outright sexual advances. He marginalized those who declined, which forced many of them to leave their positions, a pattern that substantially contributed to a conspicuously high turnover rate. Collin County Human Resources collects data on employee turnover rates. According to data collated by that department, in 2013, when Defendant Willis had been in office for almost two years, the projected annual turnover for felony prosecutors was 8%. Ten years later, the same report shows the projected felony prosecutor annual turnover for 2022 as 32%.

45. Like Chief Pickrell, and Jane Does 1 and 2, Defendant Willis sexually harassed VyKim Le on many occasions. Ms. Le is an attorney, and a prosecutor in the DA's Office. She is uniquely positioned to report directly to Defendant Willis as a feature of her role as a Pre-Trial Diversion Prosecutor. This is a Division of one prosecutor where she reports directly to Defendant Willis, a point of access that he has frequently exploited to harass her. Defendant Willis repeatedly told her he loved her and that he "enjoys her." Like he did with Jane Doe 2, he asked VyKim Le if he could come to her home. He asked Ms. Le if she "dreamed" about him "last night." He questioned about her dating life, and asked her to report to him if she started dating someone. She declined his repeated unwanted sexual and romantic overtures. As is his pattern with so many female employees, Defendant Willis repeatedly rubbed Ms. Le's back and moaned while pulling her breasts into his body for extended, unwanted hugs. He also held several closed-

door one-on-one meetings with Ms. Le where he would compliment her on her beauty and appearance, causing her to feel violated and fearful.

46.     Other instances of harassment of Ms. Le by Defendant Willis include a time when Willis asked that Ms. Le get up from the seat across from his desk, and insisted that she moved to the tall bar-height table. Ms. Le was wearing a skirt. She complied, and sat in a chair at the tall bar table in his office. Defendant Willis slid his chair over to her at eye level with her skirt opening and stroked her leg with his hand while she was attempting to explain a report. He smiled with pleasure as he did this and moaned while he touched her, with his eyes closed. This went on for a couple minutes and she was trapped in that moment—frozen in shock and fear. Ms. Le, like the other Plaintiffs, felt added intimidation about exposing Defendant Willis for his abuses because of the enormous power he wields over the criminal justice system in Collin County. This fear appears founded by the experience of Fallon LaFleur, as described in subsequent sections of this Complaint.

47.     Another instance occurred when Ms. Le was in Willis' office to discuss a business matter. He feigned that he could not find a file on his computer, and he asked that she come around to his side of the desk.  Defendant Willis repeatedly contrived this scenario to fondle female employees, one he also deployed upon Chief Pickrell.  He told Ms. Le to sit in his tufted leather chair. Once she complied,  he pushed the chair in under the desk trapping her. Defendant Willis then began to rub her shoulders in a massaging fashion – firmly – for longer than he had touched her leg on the previous occasion. He again moaned in a sexual manner, as he had before while he massaged her shoulders. Ms. Le finally accomplished the "task" and scooted her chair back to break the encounter at his desk.

48.     On another occasion, Defendant Willis summoned VyKim Le to his office. He

instructed her to stand at a table in the blind spot of his office against the wall to the right of his desk. As she stood there, Willis grabbed a mat that was big enough for only one person to stand upon. He placed it on the floor under the pretext of helping her feet while she was wearing heels. He looked her up and down. Defendant Willis then stood next to Ms. Le, and began rubbing her forearm. While Willis rubbed Ms. Le's arm, he moaned and sighed in a sexual manner. He then said to her, "Sometimes I can't help myself." He often told Ms. Le that he "could not help himself" when he was near her.

49. While Defendant Willis was engaged in sexual harassment of the Plaintiffs, Defendant Wirskye had unfettered access to the misdemeanor and felony divisions, by virtue of his position as first assistant. Defendant Willis rarely if ever involved himself in the administration of the attorney divisions and Defendant Wirskye had tremendous discretion to treat his subordinates however he wanted. He consistently chose to torment them. This behavior is documented through the first of the "Anonymous Letters" which is dated October 2019 and was initially sent to the District Attorney. The letter is addressed to "Collin County District Attorney Willis" and states:

> "ADA's have left Collin County due to the bullying, intimidation and harassment by your 1st Assistant, Bill Wirskye. I understand that you personally do not routinely conduct exit interviews and you personally do not speak with those leaving the office without Bill present. I will submit that no one currently in your office is going to communicate to you regarding Bill's behavior, his temper, or his bullying of ADA's. His conduct is intentional, intimidating and pervasive.
>
> Since you don't speak directly with your Misdemeanor ADA's or Felony ADA's this letter will inform you of some of the actions that have occurred and are currently

*occurring in your office.  This is the tip of the iceberg and the adage "where there is smoke there is fire" is true in this case.  Listed below are some examples:*

- *A misdemeanor meeting was held, and everyone was told to put their cell phones in a basket and then they were "screamed and yelled at" and then told not to tell anyone about the meeting.  Really?  Adult professionals are being intimidated and reprimanded like this in your office?  Consider that Bill is over 6 tall and that he is physically intimidating.  Intimidation of any employee is hostile.*

- *When ADAs resign as a result of targeted harassment, Bill is instructing them that if they say anything negative about him, he will insure they never work again.  The bullying continues beyond the role in the office. Many of those who have left the office have been coerced into resigning because otherwise they will never work as an ADA again in the state of Texas.*

- *A female ADA was told by Bill prior to leaving on maternity leave "You are not really going to take the full maternity leave if you want your job?"  This is not a joking statement from a man in a position of power.*

- *Tenured Prosecutors close to retirement are demoted or moved because they have crossed Bill.  Anyone close to retirement won't tell you what is happening in your organization because they need their job to protect their financial future.  Were these tenured prosecutors not competent or did they just not conform to Bill's expectations of bullying?  Several of these ADA's are under your leadership today but stay away from Bill.*

- ADAs are told to take Personal Business Allowance time off and campaign for your re-election. Is this ethical? Were you aware of this?

- Bill has been known to discuss which ADA's who are the most "fuckable". Whether said in the office or outside with other Chiefs this is disgusting and offensive. Is this how he decides who is a good ADA?

- There was a male ADA off-site and not one female ADA was invited. Were county funds used in any way to support or fund a "boys" only outing? This event drives a perception of discrimination in the District Attorney's office in Collin County.

- A male ADA was re-assigned because he dated a woman that ran against you, DA Greg Willis, in the recent election. Questionable from an ethics perspective.

- Bill has a "list" of the targeted ADA's he wishes to have exit the office and his very close confidants are aware of this list. Many of your Chiefs have witnessed his screaming and yelling and truly think people are being unfairly targeted. Several of them at first try to explain or defend the ADA under fire but Bill will not tolerate any explanation or feedback. His goal is to target, intimidate and exit those ADA's he doesn't personally like.

- At least five or more ADA's who resigned did so because of the treatment they received from Bill; bullying, screaming, and intimidation. These people have suffered mental abuse by the verbal attacks made by Bill. Were you or are you even aware that this behavior is going on and goes on today?

- *The surprise resignation of the Chief of Misdemeanor was due to bullying and intimidation not incompetence.*

- *Recent resignation of a highly respected female prosecutor due to targeted intimidation.*

*The next ADA is already being targeted, the screaming, bullying and intimidation is pervasive and will continue unless something is done to stop it. (Ask Bill who is next on the list) Like any good attorney will do all the above will be explained away but as you and I know there are elements of truth in every statement above. Only you can decide how best to find out what is going on in your office. I trust that as a taxpayer and voter that you will give credence to the above statements. The ADAs are working in fear and in a hostile work environment and they are afraid to say anything because they are concerned for their careers. Don't let Bill persuade you that this is something blown out of proportion. This has been going on in your office since Bill's arrival and in fact getting worse. You are losing control and Bill is gaining control. Your reputation is being destroyed by the person you trust most. The Defense Bar and Judges are aware of the situation and questioning what is going on in Collin County. They are seeing competent prosecutors treated unfairly and questioning your involvement and awareness. Informing you is my first step and consideration is being given to other avenues to expose questionable bullying actions and/or a hostile work environment in the District Attorney's office in Collin County."*

**50.** Despite the revelations in this letter, Defendant Willis did not ask Chief Pickrell or any other person to investigate allegations contained therein. Upon information and belief, the

DA did not report this letter to Human Resources nor did the DA hold any meetings to investigate the allegations from the October 2019 letter. Defendant Willis instead acted as through he never received this letter. Contrary to his feigned ignorance, Jane Doe 1 specifically recalls receiving the letter when she was his Administrative Assistant. She recalls Defendant Willis calling Defendant Wirskye into his office and asking Jane Doe 1 to leave. A few days later, Jane Doe 1 recalls County Judge Chris Hill coming to the DA's Office and meeting with Defendants Willis and Wirskye to discuss the October 2019 letter. Jane Doe 1 also recalls the next letter with allegations about Defendant Wirskye arriving in December 2019.

51.    In December 2019, a second letter was addressed to the Collin County Commissioners and attached a copy of the October 2019 letter. Jane Doe 1 recalls Defendant Hale meeting with Defendant Willis about this letter shortly after receipt. Aside from this, the Commissioners Court did not open an inquiry into the allegations contained in the December letter, nor was it recorded in any Court agendas or briefings. Upon information and belief, the Commissioners Court did not initiate any independent, unbiased investigations into the allegations. Again, like Defendant Willis the Commissioners behaved as though they never received this letter.

52.    Following these letters to the Defendants, in January 2020, a felony prosecutor gave an exit interview to Human Resources. Her description of events was extensive and detailed discrimination committed by both Defendant Wirskye and Defendant Willis. Human Resources had knowledge at least as of January 2020 that the operations inside the District Attorney's Office were of serious concern. Even if Defendant Willis and the Collin County Commissioners failed to share the October 2019 and December 2019 letters with Cynthia Jacobsen or Erica Johnson, the Human Resources Department would have undeniably learned of the severe and pervasive

discrimination from the January 2020 exit interview with the aforementioned prosecutor.

53. Meanwhile, in 2019 Fallon LaFleur *nee* Jolly had been hired into the Misdemeanor Division as an entry-level prosecutor. Becoming a prosecutor had been her childhood dream. She wanted to make a career of it, and, in fact, desired to retire from Collin County after a full tenure of public service. Ms. LaFleur had only been in the office for a few days when Defendant Wirskye began targeting her. The office encouraged new hires to frame their diplomas and to make their office "their own." Many prosecutors had their own furniture in their offices, and Ms. LaFleur was given express permission to bring in her own chairs, which were tufted and plush. On her third day at work, Defendant Wirskye came into her office and yelled "I can't sit in here. You look like a whore in a whorehouse." He then went into Ms. Le's office where she was with two other female prosecutors and he boasted that he had humiliated Ms. LaFleur about "her whorehouse furniture." Defendant Wirskye instructed Ms. LaFleur to remove the chairs, which she did.

54. Approximately a week later, Ms. LaFleur wore shoes that Defendant Wirskye didn't like and he instructed her chief to tell her to go home and change them. The next day, Defendant Wirskye came into the docket room and, in front of other prosecutors and defense attorneys, began degrading and ostracizing her because of her shoe choice the day before. He demanded to inspect the shoes that Ms. was wearing at that moment, humiliating her in front of the numerous individuals present at docket. Defendant Wirskye did not require any male prosecutors to go home and change their clothes, even when they violated the dress code.

55. It was commonplace for Defendant Wirskye to address groups of prosecutors, including Ms. LaFleur, as "motherfuckers" in division meetings. He referred to and addressed female prosecutors by the words "gossips," "bitches," "whores," and "sluts." He said that the

female misdemeanor prosecutors were causing the office to "rot from the bottom" because they were "bitches." At one training session on trial tactics and effective opening statements, Mr. Wirskye said "it's not like fucking a woman -- there's no need for foreplay." At another trial strategy training, he said, "the best victims are dead ones" and "it's like bad sex, they want to come in and blow their wad." He said that the "best victims are dead ones" because in those instances, the prosecutor does not have to listen to them, counsel them, or manage their expectations. Ms. LaFleur, Keith Henslee and Ms. Le were also present in a training where Defendant Wirskye told the female prosecutors to "get wet and stay wet." Wirskye also expressed his motto for the female prosecutors to "hook up, not down" while at conferences, meaning they should have sexual encounters at those meetings only with individuals who can advance their careers.

**56.** In addition to the sexual harassment and verbal abuse, Ms. LaFleur experienced a well-known phenomenon in the DA's Office – being "passed over." According to the District Attorney Policy manual, the District Attorney's Office is an Equal Opportunity Employer.[1]

## Section 1.03 *Equal Employment Opportunity*

The Collin County Criminal District Attorney's office is an Equal Employment Opportunity (EE0) employer. Pursuant to the Collin County Human Resources Policy Manual, "personnel matters generally are determined on the basis of merit, qualifications, and competence. They will not be influenced adversely by race, color, religion, sex, age, national origin, ancestry, veteran status or physical or mental disability (except where physical or mental fitness is a valid occupational qualification."

**57.** Despite this, promotions are capriciously denied in the Collin County DA's office to execute a pattern and practice of discrimination. Promotions are sometimes given to buy silence or complicity to supervisor misconduct while others are denied, not based on merit, but

---

[1] Collin County Criminal District Attorney Policy Manual

to punish or deter resistance to supervisor misconduct. "Team Players" who are loyal to Defendant Wirskye are rewarded and are jump-promoted from the outside.

58.     In the year 2020, during the early months of the Covid pandemic, Ms. LaFleur, in isolation, began to obtain a master's degree in criminal justice online after work hours. Ms. LaFleur read the District Attorney's Office's Policy Manual when she first started in 2019--this policy manual had been in effect since 2011. The Office encourages education that pertains to the performance of job duties.

**Section 1.31**   *Training/Professional Development*

All attorneys are responsible for assuring their own compliance with MCLE requirements. All other District Attorney employees who are required to maintain certain certifications in their jobs are also responsible for assuring their compliance with applicable continuing education certification requirements.

The District Attorney's office encourages professional development and continuing education for all employees. Authorized attendance at in-service training or seminars directly related to the employee's job is considered regular work time. All other continuing education seminars and classes should be taken outside of the regular work schedule.

To request approval to attend a training seminar/ conference, an employee should submit a written memorandum to her/his supervisor (with a copy to the appropriate training coordinator, Administrative Manager and the First Assistant District Attorney) describing why the training would be beneficial to the operations of the Collin County Criminal District Attorney's office. The seminar name, location, dates and total costs involved should also be included. The First Assistant District Attorney in conjunction with the appropriate training coordinator makes final authorization. Availability of funds, value of/need for the training, seminar cost and location, travel costs, seminars previously attended by the requestor and work coverage are included among the factors considered in determining approval.

59.     As seen above, the policy manual is emphatic in its encouragement for prosecutors to continue their law enforcement development; however, when Ms. LaFleur sought an online degree in criminal justice after-hours during the pandemic, Defendant Wirskye was furious that she was pursuing after-hours education and he made sure she knew it. He deemed her schoolwork a distraction from her duties and an act of "team" disloyalty that he would punish. Wirskye told Ms. LaFleur that he questioned her commitment to his "team" and threatened her: "you are up for felony soon and I will not forget this." Defendant Wirskye's punitive threats against Ms. LaFleur were commonplace. Defendant Wirskye often threatened future retaliatory actions and other consequences during day-to-day work. Anything could set him off, and in turn, damage a

subordinate lawyer's career. Wirskye's "team" ethos was a device he used to harass and discriminate against women in the office. Ms. LaFleur was repeatedly passed over for promotions because Defendant Wirskye did not believe she was loyal to his "team." In practice, being on Defendant Wirskye's "team" required being male or, alternatively, being a woman willing to drink copious amounts of alcohol with him after work. Wirskye organized out of town weekends for male prosecutors to the exclusion of female ones. Defendant Wirskye used his position as First Assistant to insist that subordinates revel with him over him alcohol and bawdy, often misogynistic, banter. He repeatedly rewarded those who complied with those demands and punished by exile from his "team" those who didn't, like Ms. LaFleur.

**60.** "We don't have policies, we have tendencies" is a phrase used commonly by Defendant Wirskye. His odd bromide is a telling admission, because in practice, it is violative of law prohibiting workplace discrimination and sexual harassment, as well as the Collin County District Attorney's Office Policy Manual regarding the same. The Office has policies that are clear and have been in effect since January 3, 2011. For example, the policy against Sexual Harassment:

### Section 1.19    *Unlawful Discrimination/Sexual Harassment*

All employees should be able to work in an environment free from all forms of illegal discrimination, including harassment. The District Attorney's office prohibits any form of discrimination or harassment related to race, color, age, religion, sex, national origin, disability or veteran status. Such actions will not be tolerated and are inappropriate, offensive and, in most cases, illegal. Any employee who violates this policy may be subject to disciplinary measures up to and including dismissal.

If an employee believes they have been subjected to any form of harassment or have observed another individual being subjected to such treatment, it is their responsibility to report it to a supervisor, manager, or Human Resources. Any such complaint will be kept confidential,

to the extent possible, and the matters will be promptly investigated and appropriate actions will be taken. Collin County prohibits any form of retaliation against an employee for filing a bona fide complaint under this policy or for assisting in a complaint investigation. However, if after investigating any complaint of harassment or unlawful discrimination, it is determined that the complaint is not bona fide or that an employee has provided false information regarding the complaint, disciplinary action may be taken against the individual who provided the false data.

Sexual harassment is a form of misconduct that undermines the integrity of the employment relationship. No employee should be subject to unsolicited and unwelcome sexual overtones or conduct, either verbal or physical. Sexual harassment does not refer to casual conversation or compliments of a socially acceptable nature. It refers to sexually-oriented behavior that is not welcome, and creates uneasiness on the job. Such conduct, whether committed by supervisors, non-supervisory personnel, vendors, contractors, etc., is prohibited. This includes repeated offensive sexual flirtations, advances or propositions, continued or repeated verbal abuse of a sexual nature, graphic or degrading verbal comments about an individual or his/her appearance, the display of sexually suggestive objects or pictures, comments, jokes, innuendo, or any offensive or abusive physical contact. No individual should imply to an employee that cooperation or lack of cooperation of a sexual nature would affect employment, assignment, compensation, advancement, career development or any other condition of employment. Any such action may bring prompt disciplinary actions, including the possibility of termination.

61.     Upon information and belief, Human Resources has never alleged "false data" being provided to them by anyone who has reported misconduct at the District Attorney's Office over the years.

62.     Ms. LaFleur was able to push through the emotional and psychological abuse outwardly, but behind closed doors, she was barely surviving. In fact, Ms. LaFleur made an attempt on her own life because of this severe and pervasive discriminatory workplace. Ms. LaFleur's supervisors, including Defendant Wirskye, learned of the young prosecutor's suicide attempt through a back-channel in law-enforcement. The responding officer to Ms. LaFleur's suicide attempt phoned the District Attorney's Office without Ms. LaFleur's consent or knowledge. Soon after, Chief Pickrell heard Defendant Wirskye's Chiefs call Ms. LaFleur "crazy" and make other derogatory and demeaning comments about her mental health. Defendant Wirskye made disparaging remarks about Ms. LaFleur to her colleagues and peers and in fact her

supervisor told her to "put her game face on" when she was called to meet with him later on in the week. Ms. LaFleur made an attempt on her life on Saturday, and was set to first chair a domestic violence trial on the following Monday. Chief Pickrell heard Defendant Wirskye also say that Ms. LaFleur made an attempt on her life in an effort to get out of trial.

63.     Defendant Wirskye acted upon his threat to Ms. LaFleur that he would not promote her to a felony prosecutor position. She was never promoted to felony – a fact that severely limits her earning potential as of today in private practice. Ms. LaFleur receives two court appointed cases per month on average and is barely able to make a living. Defendant Wirskye's harassment, discrimination, and abuse of Ms. LaFleur caused her to experience substantial and permanent harm, economically, physically, and psychologically.  She has since been diagnosed with PTSD arising from experiences foisted by Defendant Wirskye in his command over her.

64.     Overwhelmed by Defendant Wirskye's abuses of her, Ms. LaFleur resigned her post at the District Attorney's Office, forfeiting her life's dream in exchange for her survival. Ms. LaFleur had a final exit interview with Defendant Willis in May 2021, alone and once again with the door closed. She told him in detail of the abuses of Defendant Wirskye and Wirskye's Chiefs. The District Attorney acted as though he had never heard this (despite the October 2019 and December 2019 letters). He said "I've never heard any of this before." Defendant Willis said, as Ms. LaFleur was leaving his office "don't worry, I'll keep your secret" and then proceeded to give her a full-frontal hug while her arms were stiff beside her body. He rubbed her lower back with his hands and pressed her breasts against him.

65.     Ms. LaFleur also reported to Human Resources what transpired under the administration of Defendant Willis and Defendant Wirskye. Human Resources told her they had never heard any of this before. Ms. LaFleur understood then as she does now that Human

Resource's claim of ignorance was untrue, as she had been told by others that they, prior to Ms. LaFleur doing so, had reported same or similar abuses to Human Resources. Moreover, the Anonymous Letters detailing misconduct committed by Defendant Willis, as well as under his authority, had been received in the DA's Office and in Commissioner's Court in October 2019 and December 2019. Ms. LaFleur's exit interview was in June 2021.

66. In August 2021, the third of the "Anonymous Letters" appeared, detailing misconduct in the DA's office. Defendant Wirskye deeply resented Ms. LaFleur and took deliberate actions to harm her career even after her resignation. Part of Defendant Wirskye's persistent rage toward Ms. LaFleur stemmed from his belief that she was the author of one of the Anonymous letters that described his abusive workplace conduct. In a courtroom docket setting, Defendant Wirskye expressly accused her of having written such a document. He made this accusation in a room full of prosecutors and defense attorneys who were colleagues of hers.

67. To make ends meet after leaving the District Attorney's Office, Ms. LaFleur became certified to teach classes for probationers (Substance Abuse and Anger Management Evaluations). Subsequent to her certification, Ms. LaFleur learned the District Attorney's Office was refusing to accept probationers' classes taught by her, thus blacklisting her from income opportunities. Upon further inquiry, Ms. LaFleur discovered that the DA's office will accept an un-approved internet class, but *not* a class taught by her. The ostracizing was without justification or any merit-based reason. Ms. LaFleur's enrollments have gone down considerably because the Defense Bar understands that the DA's Office will not accept the probationer's credits, and thus, it's pointless for their clients to enroll in classes taught by Ms. LaFleur.

68. It is clear that Defendants Willis, Wirskye, and Collin County have retaliated against and harmed Ms. LaFleur for reasons that include her being a female who won't imbibe

with her male boss (Defendant Wirskye), for her candid report to HR about harassment and discrimination in the District Attorney's Office and for Defendant Wirskye's belief that she was the author of a letter that described the abusive environment that Defendants Willis and Wirskye engender and exploit.

69.     The August 2, 2021, Anonymous Letter (the third) is addressed to First Assistant Bill Wirskye and cc's the District Attorney, Greg Willis, Collin County Judge Chris Hill, Members of the Commissioner's Court and the Collin County Human Resources Department. The letter describes that the author has been told about the "get wet and stay wet" remark; how Defendant Wirskye refers to prosecutors as "motherfuckers;" how Defendant Wirskye referred to a prosecutor as a "whore in a whorehouse" and that Defendant Wirskye ordered employees to excommunicate former employees by saying "Don't associate with people who leave" which the author identified to be "emotional abuse." The letter describes that Defendant Wirskye accused two prosecutors of having an affair yelling in the office, "are you two fucking"? The letter describes a hostile work environment whereby female employees were only allowed to say "good morning" to Defendants Wirskye and Willis, disallowing any further communication aside from this. The letter describes Defendant Wirskye saying "who fucking raised you" to a female attorney who he had accused of speaking out against the office. Routine humiliation is described through the "Peter Principle" as the letter outlines – wherein a prosecutor forgot to file a motion during trial and was subsequently humiliated publicly and openly in division meetings well after the event, resulting in an emotionally abusive work environment. The letter describes Defendant Wirskye saying, "we don't have policies, we have tendencies."

70.     The third letter proceeds on page 2 to describe a time when a female prosecutor wore a scarf to work. She was ordered by Defendant Wirskye to remove it because he said it

looked like she had a hickey on her neck that she was trying to cover up. The letter describes that he ordered the prosecutor to never wear a scarf again. The third letter further describes a culture of coerced silence and oppression and describes how female attorneys are told to change their personalities, remain unnoticed and be less vocal, and ordered to be silent during meetings. The third letter describes Defendant Wirskye calling female prosecutors names such as "bitches" "sluts" "whores" and "gossips" while demanding that female prosecutors only wear skirt suits rather than pant suits. The author describes that Defendant Wirskye sends women from the office to a convenience store to get a drink for him when he's thirsty and states that Defendant Wirskye demoted a female employee for posting on her own private social media "what she deems cute to wear to work." The letter goes on to describe that "when an employee considers leaving due to the above noted situations or perhaps just to find a better suiting job for that individual person, the employee is demoted to Auxiliary Court as punishment (humiliating and emotional abuse)." Finally, the letter describes that a female employee was a member of a "Working Moms Group" and that when Defendant Wirskye found out that she had reached out for support, "she was forced to make a decision in one day to quit the group or quit her job."

71.    The third letter closes by saying "To all who have been cc'd on this letter, the above 19 statements are just the ones I have heard about. I implore you to understand that if you were to reach out to folks in the office about these situations, you will find, perhaps, many different reactions. There are employees who need their job and are/will be afraid to say anything for fear of losing their job or retaliation by the organization. And also, just because you may see some employees smiling or laughing in the hallway, that does not mean these things aren't happening. There will be some employees who will be relieved that someone FINALLY spoke up on their behalf as they have been going to work day after day feeling these terrible pressures and having

to be subjected to your behavior…. Either way, you have an opportunity for growth right in front of you. CHANGE needs to happen and happen NOW. There is NO room for behaviors such as these, Mr. Wirskye, especially in a position of authority such as yours. As stated before, some of these bullying and sexual harassment situations have already been reported, but the treatment continues to exist." The letter is signed "A concerned citizen of Collin County." [2]

**72.** Another letter dated "August 2021" is addressed to DA Greg Willis, Collin County Commissioners, District Judges, County Judges and the Collin County Human Resources Department. This letter begins by saying "Why has nothing changed at the Collin County DA's office in almost two years? What will it take for someone to stop the bullying, sexual and emotional harassment that has been occurring over the years? Who in a leadership position should be held accountable for the barbaric conditions that the ADA's work under today. You are all complicit in the atrocities that are occurring within your sphere of influence. Attached are letters sent to Greg Willis, Commissioners in October 2019 and the recent letters that have surfaced. ADA's current and former are still terrified of the power of influence that Bill Wirskye and Greg Willis hold over them. The next step is to send the entire package of information to all television stations in the Dallas area to expose the environment in Collin County." The letter is signed "A Concerned Citizen."

**73.** Excerpts from the fourth "Anonymous Letter," dated August 12, 2021, are set forth below:

---

[2] AUGUST 2, 2021 Anonymous Letter

**Anonymous Email Sent to All Collin County Judges on August 12, 2021**

I am so nervous writing this email because I am a current Collin County prosecutor.

I want to address the rumors that have been going around about my office and Bill Wirskye. I can say from personal experience that these rumors are true.

While I am terrified of doing this, I have to speak out for myself and the incredible team I work with. I hope that by bringing awareness to the issue, something can be done. Most of us feel helpless because of the environment we work in. There are no internal avenues to get help and most of us have bills to pay and/ or families to support so we can't just up and leave. I envy those who have had the courage to forge their own paths, but for me, there is too much at stake in my personal life. Also, I love the work I do and I don't want to be "run out of the office" (Wirskye's words). Feelings of being trapped have been expressed by many coworkers in the office. Therefore, I have no other choice but to remain at the CCDA's office where we are mistreated, verbally abused, and made to feel worthless.

It is hard to come to work every day to be treated like a child. Wirskye always tells us "you motherfuckers don't know shit" or "find an adult" like we can't handle the job. I didn't go to law school for three years, accumulate a mountain of debt, and suffer through the bar to be treated like this in the workplace. My team is filled with incredibly smart, ambitious people, but we are torn down by our leaders. At first, I thought the mistreatment was like hazing… tear you down to build you back up again, but after being torn down, I have yet to be built back up. Or I thought once I got out of misdemeanor, conditions would improve, but no such luck. It has started to weigh on my mental, emotional, and physical health. Working here has made me lose all confidence in myself and I know many of my coworkers feel the same.

In regards to the other letters that have been circulated, I can say that I have personally seen or been made aware of almost everything in those. I don't want to rehash all of the accusations in those, but I know that those situations were real and had a big impact on the people that remain in the office. We are ruled with fear, something I wish would change.

I don't know what can be done to help us. I hate to call for someone to run for DA that would be committed to improving the office culture, but I don't know what other option we have. It seems like as long as Wirskye is running the show, nothing will change.

Thank you for your time and please help if you can.

74.     A fifth Anonymous Letter, which was also sent during August 2021, begins: "To Anyone Who Cares About Restoring the Integrity of Collin County" and describes how "Bill Wirskye "treats his subordinates, particularly female prosecutors." The letter says that "the trouble…started long before Bill Wirskye arrived. Greg Willis, the current Collin County District Attorney, is part of the problem."

75.     The fifth letter continues to describe solo meetings with Defendant Willis where he asked personal questions and said "the grooming started with the basics" before he "dove right into inappropriate questions" such as inquiring of a female prosecutor the reasons for her divorce. The author described that the meeting with Defendant Willis was not optional, and that the prosecutor could not afford to quit or get fired, so she answered the questions vaguely instead of refusing to answer, "his harassing question." The author describes in the next paragraph an instance where the DA "instructed her to role play." "She had to pretend that she was him and he pretended that he was her. He then switched places with her by placing his hands on her biceps then physically turning her around. He then asked this prosecutor what she wanted him to call her. Uncomfortable with his sexual innuendos, she asked him what he meant." "He provided a couple of options: "DA [insert her last name] or Madam DA." "Even though she didn't want to participate in his game, nor did she want him touching her, she felt trapped." "After his monologue, he commented that she looked skinny and then dismissed her to go eat lunch."

76.     On August 26, 2021, a sixth Anonymous Letter surfaced at 11:46 a.m. attncollincounty@gmail.com wrote: "A prosecutor is supposed to stand up for victims; protect those who cannot protect themselves and be a voice for the voiceless. Working at the Collin County District Attorney's Office under Greg Willis and Bill Wirskye, I lost my voice. I lost it because it was strangled from me." This letter is four pages long and specific, going so far as it lists names of prosecutors who have knowledge of the abuse. Although this letter is anonymous, it is not short on information, including specific leads that the recipients could have followed up with for investigation, as noted on the email as well as the commissioners who are also addressed. The Defendants received this communication, yet failed to act in any reasonable manner to address it.

77.     The sixth letter repeats, as other letters have, that Defendant Willis received notice of the sexually harassing and abusive environment at the DA's Office in October 2019. "Willis has been told many times, to his face and in written form, about the verbal abuse and sexual harassment foisted upon his staff by Wirskye but Willis refuses to act. Willis was sent a letter in late 2019, a copy of which was also mailed to every county commissioner, that detailed the abuse and toxic work environment at the DA's office; yet zero action was taken." It continues, "The citizens of Collin County have elected a District Attorney who leaves his employees to be victimized by his First Assistant because he refuses to act on the information given to him over and over again."

78.     The sixth letter repeats that letters have been sent to District Court Judges, the media and others in Collin County, but highlights that the incidents mentioned thus far do not detail all of the abuses. There are more, as described in the 26 August letter:

- At one Friday meeting, where prosecutors are regularly railed at, Wirskye yelled to a room full of prosecutors that opening statements were "not like fucking a woman, there's no need for foreplay."
- Also during meetings Wirskye has speculated who a secretary has been sleeping with and has discussed blow jobs
- Wirskye has told a prosecutor they would not be allowed to attend a training because they gave birth that year
- He has told a prosecutor that while he "can't tell [her] not to take [her accrued] vacation time [she] should think very hard before [using] any"
- During a misdemeanor meeting, Wirskye has collected the prosecutors phones so they 'cannot record' what he is about to say and then proceeds to scream at them and call them 'motherfuckers'
- He forced a prosecutor to choose between shutting down a non job related social media profile or getting fired
- Prosecutors are told that if they don't like what's going on they can "tell HR [because he, Wirskye, doesn't] give a fuck." Prosecutors know however, that if they go to HR they will be let go immediately
- He has held meetings with other Chief prosecutors where he discusses which prosecutors are "fuckable"
- He tells prosecutors not to associate with or socialize, in person or on social media, with those not in his favor or those prosecutors who have left the office
- Wirskye has driven prosecutors in his vehicle after drinking heavily
- Prosecutors are also told to prioritize the job over everything else, he then goes on to say "I know it's harder for moms but too bad, make it work."
- Wirskye told a female prosecutor not to wear her engagement ring in a court

- Wirskye repeatedly screams "fuck" at the prosecutors and around them. Being screamed at by a 6'5" man is frightening and uncomfortable
- Wirskye helped plan a male only prosecutor weekend get together, women were not allowed or invited
- Wirskye told a prosecutor about to go on maternity leave that if she was really dedicated to her job she wouldn't take all her maternity leave
- Female prosecutors were asked if they felt as if Wirskye (and another felony Chief) were sexist and acted in demeaning ways to them; there was a consensus that they did act this way
- Wirskye expects you to come into the office for hours on the weekend and wants to know when you were there. Prosecutors often make sure their Chief knows they are at the office on the weekend so they will get "credit" and not be degraded the next week. These hours are unpaid and viewed by prosecutors as mandatory.
- Wirskye yelled at a female prosecutor until she cried
- Prosecutors were told to "hook up not down" when Wirskye was discussing who people should sleep with at the Annual TDCAA Conference
- Wirskye has demoted prosecutors for actions such as: blocking him on Twitter and rolling their eyes
- Prosecutors regularly have to seek therapy to deal with the abuse and harassment from Wirskye

**79.** The letter continues: "Also, responsible for letting a toxic work environment take hold is the Collin County HR Department. There have been multiple exit interviews where they have been told in detail about the abuse suffered by those leaving the office. They have left employees in a toxic environment. If they have acted it is unknown to those still working at the DA's Office and there has been no change enacted."

**80.** The letter describes the power and control dynamics in the abusive DA's Office.

The author describes an employee of the DA's Office as being akin to a domestic violence victim. The letter also describes the retaliatory environment and what will happen outside the four walls of the DA's office if a victim is to outcry to someone outside the system: "He [Wirskye] knows exactly who to say these things in front of, who will back him because they owe him, and how far he can push a prosecutor because with one phone call or email he can ensure they don't get hired anywhere. Wirskye tells prosecutors, when they hand in their resignation letter, that as long as they "don't bad mouth" the office then he won't "bad mouth" them. "Keeping one's hands clean and projecting a positive public persona while causing irreparable psychological damage is the hallmark of an abuser." The letter closes with the sentence "[a]ll we ask is that injustice is answered with justice."

**81.** Jane Doe 2 intended to resign before the August Anonymous Letters were

transmitted to the DA's Office, Commissioners Court members, news agencies, judges, and neighboring District Attorneys. After wide circulation of the August 2021 Anonymous Letters had occurred, Defendant Willis gave lip service to cleaning house. He gave Jane Doe 2 hope that she could assist him in navigating the damage caused by these revelations and make positive workplace changes. Defendant Willis talked her out of resigning under the pretense of presenting her the opportunity to do crisis management PR. Defendant Willis acknowledged to Jane Doe 2 that the allegations were concerning and needed to be addressed.

82.     Although he acknowledged the letters, Defendant Willis did not conduct nor commission any independent investigation. He made no personnel changes in response to the letters nor did he remove Defendant Wirskye from his post. Defendant Willis did not modify his own inappropriate behavior or take any affirmative and effective steps to modify Wirskye's. Defendants Willis and Wirskye were very focused on trying to root out who wrote the Anonymous Letters but disinterested in making any personal behavioral or workplace cultural changes in response to them.

83.     Eventually, Jane Doe 2 resigned for similar reasons as Ms. LaFleur, which include sexual harassment and the toxic, discriminatory environment towards her and other women in the workplace. Defendant Willis asked Jane Doe 2 to remain publicly vague about her reason for leaving– that she was merely "unhappy." Jane Doe 2 told him exactly why she was leaving, but he did not have any interest in remediating the real problems of harassment and discrimination he committed, fostered and helped make pervasive.

84.     Collin County Commissioners exhibited conscious disregard for the issues described by the Anonymous Letters. Commissioner Darrell Hale responded as follows to Letter #6 about titled, "The Toxic Environment at the Collin County DA's Office:



**Re: The Toxic Work Environment at the Collin County DA's Office**
2 messages

**Darrell Hale** <dhale@co.collin.tx.us>                                          Thu, Aug 26, 2021 at 11:52 AM
To: Attention Collin <attncollincounty@gmail.com>

I would advise you to speak to Cynthia Jacobson.

Darrell Hale
Collin County Commissioner
214 471 3584

85.     At 2:43pm on August 26, 2021 – less than three hours after the original email was

Sent, Commissioner Susan Fletcher fired back a response from her iPhone and from her county

email address with her official county signature line apparent in her reply. In her reply, she states:

- "I take issue with the author that they claim a letter with similar concerns was "mailed to every county commissioner" in late 2019.

- "As the author points out, no one has actually made any formal complaints that can be properly investigated. Knowing this, exactly how is our HR Department or DA Willis supposed to address these anonymous accusations? I would assume that professional prosecutors would understand the importance of a credible witness (who's willing to go on the record), or at least the importance of verifiable evidence. There are laws to protect employees and there is accountability."

- "Of course, if there is ANY truth to these allegations, I would certainly never want it to be ignored. But the anonymous nature of this information has all the hallmarks of a disgruntled employee (or former employee) seeking revenge. If it's more than that, please come forward, for the sake of all victims. Without the ability to properly investigate these claims, there is little that can be done from an official standpoint, besides asking questions, which I have already done. To date, there is

nothing actionable without identifiable victim or witness, as it's all based on anonymous claims."

- "To the author of this email, my door has always been open and I would NEVER want any of our employees to be harassed or mistreated in any way. I literally didn't know anything of this until I received a request for information last week. My mobile number is below, my door remains open…and I will listen."

86.    In her email, Defendant Fletcher claimed to have investigated the misconduct described in the Anonymous Letters. Yet she also indicated an unwillingness to use any real effort to conduct an investigation, rhetorically asking "[e]xactly how is our HR Department or DA Willis supposed to address these anonymous accusations?" Obviously, she and other Commissioners could have personally interviewed or retained a trained professional to interview female prosecutors and female investigators on a confidential basis to discern if they knew whether what was described in the Anonymous Letters was accurate, plausible and/or a shared experience. She could also have interviewed Defendants Willis and Wirskye to obtain an assessment of what factual accounts appeared to align among those interviewed and where they didn't. Defendant Fletcher could have performed at least a modicum of effective due diligence rather than simply dismiss the Anonymous Letters that described discriminatory, harassing, abusive, and reprehensible conduct at the highest levels of the DA's office, as merely the gripe of a "disgruntled employee." She did none of those things. Kim Pickrell is the Chief Investigator in the DA's office. She wouldn't have been hard for Commissioners to find for an interview to see what she knew and what she had experienced. Defendant Hale also did nothing, as it took him only ten minutes to respond to the anguish expressed by the writer of the August 26, 2021 letter, by dismissing the whole matter as not his problem. The Plaintiffs and others like them in

the DA's office had nowhere to turn for help, knowing they would be retaliated against by Defendants Willis and Wirskye, ignored by the feckless HR Department, and disregarded by a Commissioner's Court that made it unmistakably clear they didn't care.

**87.** In juxtaposition to its conduct, Collin County purports to be an Equal Opportunity Employer:

### Equal Employment Opportunity
We are an equal opportunity employer.
Personnel matters generally are determined
on the basis of merit, qualifications, and compe-
tence. They will not be influenced adversely by

race, color, religion, sex, age, national origin, ancestry, veteran status or physical or mental disability (except where physical or mental fitness is a valid occupational qualification).



**88.** Further, the Collin County Handbook prohibits Harassment of any kind:

# *Harassment*

We believe that all employees should be able to work in an environment free from all forms of illegal discrimination, including harassment.

If you believe that you have been subjected to any form of harassment or have observed another individual being subjected to such treatment, it is your responsibility to report it to your supervisor, manager, or Human Resources. Your complaint will be kept confidential to the extent possible. Your concerns will be promptly investigated and appropriate actions will be taken.

Collin County prohibits any form of retaliation against an employee for filing a bona fide complaint under this policy or for assisting in a complaint investigation. However, if after investigating any complaint of harassment or unlawful discrimination, it is determined that the complaint is not bona fide or that an employee has provided false information regarding the complaint, disciplinary action may be taken against the individual who provided the false data.

89.    Sexual Harassment is also prohibited by not only the laws of the United States of

America, but by Collin County itself:



**Sexual Harassment**

Sexual harassment is a form of misconduct that undermines the integrity of the employment relationship. No employee should be subject to unsolicited and unwelcome sexual overtones or conduct, either verbal or physical.

Sexual harassment does not refer to casual conversation or compliments of a socially acceptable nature. It refers to sexually oriented behavior that is not welcome, and creates uneasiness on the job.

Such conduct, whether committed by supervisors, non-supervisory personnel, vendors, contractors, etc. is prohibited. This includes repeated offensive sexual flirtations, advances or propositions, continued or repeated verbal abuse of a sexual nature, graphic or degrading verbal comments about an individual or his/her appearance, the display of sexually suggestive objects or pictures, comments, jokes, innuendo, or any offensive or abusive physical contact.

No individual should imply to an employee that cooperation or lack of cooperation of a sexual nature will affect employment, assignment, compensation, advancement, career development or any other condition of employment. Any such action may bring prompt disciplinary actions, including the possibility of termination.

90.    The Plaintiffs were deceived by Defendants into believing that the Defendants would follow the law and their own written mandates to provide a safe workplace. In April 2022, several Plaintiffs reported horrific abuses by Defendants Willis and Wirskye to Human Resources.  Doing so changed nothing other than to intensify their mistreatment by Willis and Wirskye. Collin County leadership and Human Resources deemed Defendant Willis to be "untouchable" for workplace sexual misconduct and illegal retaliation, while his First Assistant is permitted to continue with impunity to refer to women in their workplace and in their presence as "bitches," "sluts," and "whores," while publicly imploring them to "get wet and stay wet."

91.    In early 2022 after it had become clear she would never succumb to his sexual advances, Defendant Willis retaliated against Chief Pickrell claiming she spoke ill of him to other

investigators. This perception caused his mood and temperament to become erratic and on February 22, 2022, he berated her in a closed-door meeting and told her expressly that he did not like her and did not like speaking with her because she had bad-mouthed him to other employees in the office. Chief Pickrell did not know what he was referring to and had not spoken ill of him to other investigators. After scolding Chief Pickrell, he told her that if she could "learn" from this experience, they could perhaps be "closer than ever before." From many past interactions, Chief Pickrell understood him clearly: if she were to cede to his romantic advances and remain loyal to him by keeping silent about these matters, her career would prosper; if she did not, she would be marginalized by him.

92. On March 31, 2022, Defendant Willis took action to make good on this threat. He entered Chief Pickrell's office and sternly told her that he was not going to promote one of her investigators into the position he previously told her he would. Defendant Willis was punishing Chief Pickrell's subordinate because he was upset with Chief Pickrell. His tone then shifted and wistfully, he added that Chief Pickrell "always looks good."

93. Chief Pickrell, at wit's end after years of sexual harassment and manipulation, went to Human Resources to report Defendant Willis on April 6, 2022. After Chief Pickrell shared her traumatizing account of events, Human Resources asked her to come back the next day, April 7th to repeat it all over again with Director Cynthia Jacobsen in attendance.

94. On April 7, 2022, Chief Pickrell, Deputy Chief Henslee and Jane Doe 1 went to Human Resources together and described what they experienced through their interactions with Defendant Willis. In the April 7, 2022, meeting, Human Resources told Chief Pickrell, Deputy Chief Henslee and Jane Doe 1 that "the DA is untouchable" and that there is nothing that Human Resources can do to make the harassment stop or to protect them. In fact, at several points in the

conversation with Human Resources, Cynthia Jacobson said "let's be honest, he's the DA and nothing's going to happen to him." Jacobsen briefly mentioned they could make a report to the EEOC. Ms. Jacobson said that Willis is the DA and "you can go after them civilly" but from the HR standpoint, he is "untouchable."

95.    In response to Cynthia Jacobsen's statement that the "DA is Untouchable," Deputy Chief Henslee correctly pointed out that the Collin County Handbook as well as the District Attorney Policy Manual require him to report sexual harassment and protect him from retaliation for doing so. The Collin County Handbook and the District Attorney Policy Manual specifically protect those who report sexual harassment, regardless of who they are reporting. There is no exception for the District Attorney or anyone else.

96.    There was never any allegation that the Plaintiffs were falsifying their reports or information. Indeed, some of what Deputy Chief Henslee reported on behalf of Chief Pickrell was consistent with similar manner and means employed by Defendant Willis toward others. One of the August letters describes Defendant Willis' inappropriate inquiries about the employee's personal life in addition to the unwanted hugs described by Plaintiffs. The moaning and rubbing of the lower back are consistent across the accounts to Human Resources as are the comments about women's bodies and the descriptions of Defendant Willis' sexual harassment in the workforce, and the closed doors belittling sessions. In the April 7 HR meeting, Erica Johnson confirmed that she was not surprised by the allegations and that prior complainants had not followed through after their complaints. She said it was too hard and "they gave up."

97.    Once Human Resources dismissed Chief Pickrell, Deputy Chief Henslee and Jane Doe 1, they went back to the District Attorney's Office. Chief Pickrell and Deputy Chief Henslee informed Defendant Wirskye that they reported the DA's sexual harassment to HR that day. Upon

learning of this report, Defendant Wirskye sighed loudly, put his head on his desk, apologized and asked, *"Are there more than 10?"* Defendant Wirskye was clearly unsurprised to learn of Defendant Willis' pattern and practice of sexual harassment. Concerned about reports of his own conduct, Defendant Wirskye asked whether the issue of the anonymous letters had come up.

**98.** The very next day, on or about April 8th, Defendant Hill attended a closed-door meeting with District Attorney Greg Willis at DA Willis' office.

**99.** On the following Monday, April 11, 2022, Defendant Wirskye asked for a meeting with Chief Pickrell and Deputy Chief Henslee. He asked them to conceal the fact that they had been to Human Resources, and to not tell anyone else in the office about the report. Chief Pickrell told Wirskye that she already told co-workers Kim Laseter and Evelyn Rutherford. Defendant Wirskye was angry and became angrier during this meeting – his temperament had changed considerably since April 7th.

**100.** On May 9th, Defendant Wirskye sent Chief Pickrell a meeting request. In that meeting, he stripped Chief Pickrell of her duties and responsibilities, including her supervision of the Victims Assistance Coordinators and the Victim's Assistance secretary (a total of 5 employees) and supervision of the secretarial staff (more than 20 employees). She was also stripped of the privilege of interviewing candidates for secretarial positions, the privilege of planning the Tree of Angels event, the privilege of organizing the Annual Crime Victim's Luncheon, of being the supervisor of the VOCA Grant, and of being the Foray project liaison for the office. Chief Pickrell lost all of these responsibilities when Defendant Wirskye retaliated against her because she reported to Human Resources. Additionally, Defendant Wirskye changed the chain of command entirely – requiring the entire Investigator staff to report to him, and to their individual court chiefs. This had never been done before as the investigators always had a

separate chain of command, reporting to the Chief Investigator.

**101.** The retaliation did not stop with Chief Pickrell. Deputy Chief Henslee was stripped of the entirety of his duties as Deputy Chief of the Investigator "chain of command." For years, he assisted Chief Pickrell in supervising the investigators at the DA's Office, yet on May 9th, Defendant Wirskye retaliated against him for reporting to Human Resources by assigning him to a regular Felony Court. Deputy Chief Henslee would now be working a trial court, which is effectively entry level felony investigator work. Defendant Wirskye ordered Henslee to move his office immediately and assigned him to an office next to the women's restroom. In the process of moving his standing desk at Defendant Wirskye's demand, Henslee suffered a bicep tear for which he remains injured. The injury required surgery and for Deputy Chief Henslee to take Workman's Comp. Deputy Chief Henslee was stripped of many other duties as well, inherent in his former position as Deputy Chief.

**102.** Defendant Wirskye did not stop retaliating against Chief Pickrell and Deputy Chief Henslee once he had levied these punishments. He next proceeded to concoct a "paper trail" whereby he misrepresented Chief Pickrell's work performance and chastised her for not performing duties that he had already removed from her after he demoted her. He contrived reasons for why Chief Pickrell had lost responsibilities and began making false statements to Human Resources and in her performance review so that he could create the illusion that Chief Pickrell was something other than an exceptional employee. Chief Pickrell had an exceptional record during her tenure at the DA's Office. It was only after her report of sexual harassment that Defendant Wirskye began to complain about her performance. Not only did Defendant Wirskye include these fabricated performance issues in Pickrell's official performance review, but he also disparaged and humiliated her during regular Tuesday meetings he uses to repeatedly demean her

in person and in front of Felony Chiefs. Chief Pickrell rebutted Wirskye's inaccurate statements with proof provided to Human Resources, which remain in her file, complete with exhibits. Neither Chief Pickrell nor Deputy Chief Henslee had never been written up in their performance reviews prior to reporting the discrimination and harassment.

**103.** While Deputy Chief Henslee was on Workman's Compensation leave due to the injury he sustained as a result of Defendant Wirskye's demand that he move his office himself immediately during the demotion, Chief Pickrell was ordered by Wirskye to attend daily and weekly humiliating closed-door meetings with Wirskye and his chiefs. Human Resources knew Defendant Wirskye to be abusive. Neither Collin County Commissioners nor Human Resources did anything to help or protect Chief Pickrell nor Deputy Chief Henslee.

**104.** As detailed above, Defendant Willis sexually harassed Ms. Le on many occasions. Once his advances and attempts were rebuffed she was left to navigate the perfidy of Defendant Willis' office. On June 22, 2022, Ms. Le was called into Defendant Willis' office by Defendant Wirskye. Defendant Willis was present as were some prosecutors, including a Chief. They proceeded to interrogate Ms. Le as one might experience in a custodial interview, like she was a criminal suspect. Willis, Wirskye and the others were focused on why Chief Pickrell had been recently spotted in Ms. Le's office and they collectively insisted upon knowing what Chief Pickrell and Ms. Le may have discussed. Ms. Le had no knowledge of why Pickrell and Henslee were stripped of responsibilities, and truthfully reported that fact to Willis, Wirskye, and the group. Even with that explanation, they continued to pressure Ms. Le to recount everything she had discussed with Chief Pickrell in Ms. Le's office. They persisted until Ms. Le told them accurately that Chief Pickrell and she had discussed hair conditioner and knee surgery. Satisfied that Ms. Le did not have any current intel she could report about Chief Pickrell, Defendants urged

her to be a mole for them on Chief Pickrell. They instructed Ms. Le to report any further contact with Chief Pickrell and to promptly relay to them the content of any conversations with Chief Pickrell that may ensue. She did not expressly consent to be the Defendants' mole, but she did not refuse either, for fear of retaliation. Ms. Le understood that if she agreed to be an informant for Defendants, her employment would continue, and she would be rewarded. She also understood the opposite to be true: those who aren't loyal to the "team" are further harassed, demoted, and/or fired. Ms. Le remained vague to avoid further interrogation or reprisal.

**105.** Defendant Willis subsequently said to Ms. Le, "I just want you to know how much I appreciate you" and heaped Ms. Le with praise. Ms. Le was suspicious of that praise as purely a veiled threat that she must cooperate, an offer of complicity that she could not refuse. After all, she had previously been "passed over" for promotion on repeated occasions for reasons other than merit. Later that night, another prosecutor called Ms. Le while she was at home, and told her that Willis and Wirskye were not entirely satisfied with Ms. Le's explanations earlier that day and that Defendants had asked the friend to be a mole for them on Ms. Le to get more information out of her. Just days later, Ms. Le received her first exemplary performance rating. Suddenly she "exceeded" her performance objectives and received a pay raise. The quid pro quo that the Defendants intended could not have been more obvious: she would be promoted and financially rewarded if she ceded to their demands to betray and retaliate against sexual abuse and harassment victim, Chief Pickrell, and punished if she didn't. The Defendants were betting they had bought her loyalty in this regard.

**106.** On Tuesday, July 28, 2022, in another meeting, Defendant Willis asked Ms. Le what she thought about the previous meeting. Ms. Le told him that she thought the meeting was inappropriate and unfair to her, as a six-year prosecutor in the office. Defendant Willis told Ms.

Le that he was "sorry she was being put in the middle of this without her consent." In reference to Chief Pickrell, Willis told Ms. Le, "Hell yes I want her gone," but added that that Chief Pickrell, was in a "protected class" and that he could not fire her right after her report to Human Resources. He went on to "provide context" for Ms. Le and said that the worst allegations that Human Resources told him about was that he had invited a female employee to his room at a conference and that she declined, he asked her again, and that she declined again. Willis defended himself not by denying the allegations, but instead told Ms. Le that he had "not fired or demoted" the employee. While he was flippant and dismissive when relaying the allegation to Ms. Le, he looked at Ms. Le intentionally and a clear message when he looked her in the eye and said "I never touched anyone" – a statement which Ms. Le knew to be a lie, since she had been touched more than once by Defendant Willis in a sexually harassing manner as described above.

107.  On July 12, 2022, KERA published a story wherein the defendants are quoted. The article in its entirety is produced below:

> **The Collin County District Attorney's Office is having trouble filling entry level prosecutor roles — and the DA said the current salaries for those roles are putting the county at a competitive disadvantage.**
>
> *Right now, seven of the 12 misdemeanor prosecutor positions at the Collin County DA's office are open. Misdemeanor prosecutors are typically recent law school graduates. Greg Willis, the county's DA, said other counties are also having trouble hiring people for those entry level prosecutor positions. So, they're raising their salaries.*
>
> *To compete with other counties, Willis said Collin needs to follow suit and raise its salaries for those jobs. Otherwise, new law school graduates with student loan debts won't be able to afford to start their career in Collin County.*
>
> *"It becomes quite a disadvantage, regardless of how wonderful our county is, for students with lots of loans, law school debt, to start here," Willis said.*
>
> *The average salary for a misdemeanor prosecutor in the most recent fiscal year was $65,025, according to data from the Collin County Human Resources*

*Department.*

*The HR department compared that salary rate to salaries from nine other counties, including Dallas and Tarrant counties, and the state of Texas. The average salary for those was $64,492, putting Collin County above average.*

*But Willis said those numbers don't necessarily reflect actual compensation. He said entry level prosecutors in Tarrant County end up making 10% more than the minimum starting salary, which Collin County HR data lists as an average of $61,451 annually.*

*"They're above us," the DA said about Tarrant County's actual pay rates. "Then all of a sudden, we're below average."*

*The Collin DA said there are smaller counties that aren't included in HR's data that offer as much as $90,000 for misdemeanor prosecutors.*

*Salary rates aren't the only thing impacting staffing numbers at the Collin County DA's office. Prosecutors also are leaving the DA's office for other positions. According to HR data, the projected turnover for 2022 is 22% for attorneys. That's up from a 12.5% turnover rate in 2021.*

*Cynthia Jacobson, Collin County's director of Human Resources, said about 74% of the turnover in the DA's office within the past five years was people leaving for another job. But even though the turnover rate for attorneys has gone up, Jacobson said she's not concerned.*

*"The turnover does not bother me," she said. "You can see it's actually been fairly stable."*

*Collin County Judge Chris Hill said the natural progression of the careers of beginning prosecutors in the DA's office is either getting promoted or leaving to go into private or corporate practice. If the 74% leaving are following that natural progression, Hill said he's not concerned.*

*What would be cause for alarm, he said, is if they're leaving for the same position they already have in another county.*

*Jacobson said getting people leaving the DA's office to do exit interviews has been a challenge, so she doesn't have exact numbers on why people left. However, she said she believes most people left to go into private practice.*

*Overall, Jacobson said the staffing issues in the DA's office isn't unusual. Rather, she said it's the nature of the current job market and the low unemployment level.*

*"There are about two job openings for everybody looking for a job right now," she said.*

**108.**    To put it mildly, the Defendants quoted in this article were less than forthcoming as to why the turnover rate is so high in the Collin County District Attorney's Office.  While no one should be surprised that the Defendants declined to reveal to readers that the DA's office is a hostile, discriminating, and harassing workplace that mistreats many employees, the Defendants knew then, as now, that the office toxicity foisted from the top catalyzes much of the turnover.  This is another example where Defendant Willis and other Defendants concealed from and misdirected the public as to the poisonous nature of the DA Office's workplace ethics and culture.

## V.   CAUSES OF ACTION

### A.  Texas Labor Code/Title VII/§ 1983

**109.**    The factual assertions in paragraphs 17 through 109 are incorporated into section V by reference.   Plaintiffs sue under the provisions of the Texas Labor Code, 42 U.S.C. § 2000e-2 and 42 U.S.C. § 1983 for sexual harassment (Tex. Lab Code §§ 21.1412, 21. 142; 42 U.S.C. § 2000e-2; § 1983), discrimination (Tex. Lab Code § 21.051; 42 U.S.C. § 2000e-2; § 1983), aiding and abetting (Tex. Lab Code § 21.056) and retaliation (Tex. Lab Code § 21.055; 42 U.S.C. § 2000e-2; § 1983).  The analysis of unlawful harassment, discrimination and retaliation is the same under all of the cited provisions.  *See Tanik v. Southern Methodist University*, 116 F.3d 775, 775 (5th Cir. 1997) (per curiam) ("The elements of the Title VII claim and the § 1983 claim are identical. The court evaluates these claims according to a single analysis.").

**110.**    All jurisdictional prerequisites for asserting the claims in this lawsuit have been met.   Each Plaintiff filed a Charge of Discrimination dually with the Equal Employment Opportunity Commission and the Texas Workforce Commission.  Each received a Notice of Right to Sue from the EEOC via the DOJ (Jane Doe 1 8/11/22; Jane Doe 2 9/6/22; Ms. Le 9/6/22;

Ms. LaFleur 9/7/22; Chief Pickrell 9/19/22; Deputy Chief Henslee 9/19/22).  This lawsuit is filed within 90 days from the receipt of such Notice of Right to Sue.  Additionally, each Plaintiff received Notice of Right to Sue from the Texas Workforce Commission on October 27, 2022 and this lawsuit is filed within 60 days of such receipt.

### 1. Sexual Harassment

**111.**  Tex. Lab Code § 21.142 provides that "[a]n employer commits an unlawful employment practice if sexual harassment of an employee occurs and the employer or the employer's agents or supervisors: (1) know or should have known that the conduct constituting sexual harassment was occurring; and (2) fail to take immediate and appropriate corrective action."  "Employer" is defined to include "person[s]" who "act directly in the interests of an employer in relation to an employee." (Tex. Lab Code § 21.141).  The Texas Labor Code defines "sexual harassment" as "an unwelcome sexual advance, a request for a sexual favor, or any other verbal or physical conduct of a sexual nature if: (A) submission to the advance, request, or conduct is made a term or condition of an individual's employment, either explicitly or implicitly; (B) submission to or rejection of the advance, request, or conduct by an individual is used as the basis for a decision affecting the individual's employment; (C) the advance, request, or conduct has the purpose or effect of unreasonably interfering with an individual's work performance; or (D) the advance, request, or conduct has the purpose or effect of creating an intimidating, hostile or offensive work environment."  Title VII also prohibits sexual harassment in an employment context.

### a) Defendant Greg Willis

**112.**  Defendant Willis engaged in unwelcome and pervasive sexual harassment of Kim

Pickrell, Fallon LaFleur, Vykim Le, Jane Doe 1 and Jane Doe 2. As the Collin County District Attorney, Willis has individual liability for the sexual harassment under Tex. Lab Code § 21.141 as well as 42 U.S.C. § 1983.

### i. Kim Pickrell

**113.** With regard to Pickrell, Defendant Willis' advances as described at the TDCAA welcome reception as well as office conduct involving full frontal hugs while rubbing on her and moaning, descriptions of his own arousal, forced role playing and comments on Ms. Pickrell's body were unwelcome, submission to which were implicit terms of her employment, unreasonably interfered with her work performance and created an intimidating, hostile and offensive work environment. Defendant Willis made it clear by his actions that acquiescence to his offensive conduct was part of the job. Any attempt to reject his advances was met with hostility and aggressiveness, including demanding that Ms. Pickrell sit in his office while he berated and screamed at her. Ms. Pickrell, a seasoned Chief Investigator, became fearful of bringing necessary issues to Defendant Willis' attention and fearful of one on one interaction with Defendant Willis, especially in his office. His conduct had a detrimental affect on her work environment, which became hostile and offensive to the point that she asked her Deputy Chief Investigator to sit in the next room and, when Willis began yelling at her and berating her, she might knock on the wall for the Deputy Chief Investigator to come and try to rescue her.

### ii. Jane Doe 1

**114.** With regard to Jane Doe 1, Defendant Willis also engaged in unwanted sexual touching on a pervasive basis, forcing full frontal hugs while rubbing on her and moaning. He invited her to his hotel room at a conference and when she declined, began making derogatory comments and denigrating her. She understood that acquiescence to his conduct and sexual

invites/innuendo was a condition of her employment. Additionally, his conduct created such a hostile work environment, and had such a detrimental affect on her ability to perform her job, that she was forced to transfer. However, that did not end the unwanted and offensive touching, which continued even after the transfer.

### iii.     Fallon LaFleur

**115.**     Similarly, Fallon LaFleur was subjected to Willis' unwelcome full frontal hug and rubbing while moaning. In the context of the situation, this conduct on the part of Defendant Willis was severe and created a hostile environment. Ms. LaFleur was seeking advice and remedy for Defendant Wirskye's discrimination, harassment and retaliation and was in an extremely exposed and defenseless position as she had revealed very personal information, including about how vulnerable she was. Instead of defending her and helping her restore her dignity and self worth, Willis took advantage of her exposure to him to grope her and gratify himself, exponentially sealing the damage to her psyche and self image.

### iv.     Jane Doe 2

**116.**  Jane Doe 2 was also subjected to Willis' pervasive and unwelcome sexual comments and innuendo as described herein that it affected her work environment and ability to perform her job. Since Willis' behavior was allowed to continue unabated, she was constructively discharged from her job. During Jane Doe 2's tenure with the District Attorney, Defendant Willis conducted his frequent closed-door meetings with her, just like the others. In those meetings and in other office settings, Defendant Willis made sexually suggestive remarks to Jane Doe 2, talking about her appearance, her body and her "hotness." These meetings, the attempted intimacy and the continuing sexual innuendo affected Jane Doe 2's ability to perform her job and created a hostile work environment. When the conduct continue unabated, Jane Doe 2 was constructively

discharged.

### v.    VyKim Le

**117.** VyKim Le was also forced to endure the pervasive and unwanted sexual advances and harassment by Willis, who touched her, rubbed her, and trapped her as described herein. Defendant Willis repeatedly told her he loved her and "enjoys her" and has asked to be invited to her apartment. He asked if she "dreamed" about him "last night." He asked about her dating life, and asked that if she started dating someone if she would tell him. She declined these unwanted sexual and romantic overtures. As is his pattern with so many female employees, Defendant Willis repeatedly rubbed Ms. Le's back and moaned while pulling her breasts into his body for extended, unwanted hugs. He also held several closed-door one-on-one meetings with Ms. Le where he would compliment her on her beauty and appearance causing her to feel intimidated, anxious and scared. Other instances of harassment of Ms. Le by Defendant Willis include a time when Willis asked that Ms. Le get up from the seat across from his desk, and insisted that she moved to the tall bar-height table. Ms. Le was wearing a skirt. She complied, and sat in a chair at the tall bar table in his office. Defendant Willis slid his chair over to her and stroked her leg with his hand while she was attempting to explain a report. He smiled with pleasure as he did this and moaned while he touched her, with his eyes closed. This went on for a couple minutes and she was trapped in that moment—frozen in shock and fear. Ms. Le, like the other Plaintiffs, felt added intimidation about exposing Defendant Willis for his abuses because of the enormous power he wields over the criminal justice system in Collin County. Not only have they feared for their jobs by telling the truth, they have feared other types of persecution or for their safety because of the fact that Defendant Willis is not just a perpetrator, but one who can foist the full weight of prosecutorial wrath. Another instance occurred when Ms. Le was in

Willis' office to discuss a business matter. He feigned that he could not find a file on his computer, and he asked that she come around to his side of the desk. He suggested that she sit in his tufted leather chair, and when she did, he pushed the chair in under the desk trapping her. Defendant Willis then began to rub her shoulders in a massaging fashion – firmly – for longer than he had touched her leg on the previous occasion. He again moaned in a sexual manner, as he had before while he massaged her shoulders. Ms. Le finally accomplished the "task" and scooted her chair back to break the encounter at his desk.  There was an occasion when Defendant Willis summoned Ms. Le to his office and  instructed her to stand at a table in the blind spot of his office against the wall to the right of his desk. As she stood there, Willis went to get a standing mat that was big enough for only one person to stand. He placed it on the floor under the pretext of helping her feet while she was wearing heels and then looked her up and down. He stood immediately next to her and began rubbing her forearm, sighing and moaning in a sexual manner. He said, "sometimes I can't help myself." He often said that he "could not help himself" when he was around Ms. Le.  In truth, Defendant Willis' pattern and practice of sexual harassment stems from his own personal choices, rather than an involuntary compulsion evoked by the magnetism of female employees. His workplace sexual conduct is predatory, manipulative, and entirely of his own volition. These are some of several examples of how Defendant Willis' ongoing and pervasive sexual harassment interfered with Ms. Le's performance of her job and created a hostile working environment.

### b)  Defendant Bill Wirskye

**118.**  Defendant Wirskye also engaged in sexual harassment in violation of the Texas Labor Code.  He, too, as the First Assistant District Attorney with supervisory and management authority over the Plaintiffs, has individual liability for the sexual harassment under Tex. Lab

Code § 21.141. As described herein, Defendant Wirskye engaged in pervasive and unwelcome comments of a sexual nature that created a hostile work environment for the female Assistant District Attorneys, including but not limited to Fallon LaFleur, who he called a "whore" in a "whorehouse," as well as constantly referring to all of the women as "bitches," "whores," and "sluts," referencing sexual acts and innuendos, including, but not limited to, telling the women to "get wet and stay wet" and to sleep their way to the top of the profession. His pervasive and unwelcome sexual comments created an intimidating, offensive and hostile work environment for the female employees and affected their ability to perform their jobs. The Plaintiffs, as well as the descriptions in the anonymous letters, provide details of how Defendant Wirskye's creation of a misogynistic work environment not only interfered with their ability to perform their jobs, but created an environment of dread, fear, humiliation, embarrassment, intimidation and affected their self images and self worth.

### c) Collin County

**119.** All Plaintiffs were employees of Collin County as that term is defined in both the Texas Labor Code and Title VII. Collin County is vicariously liable for the sexual harassment described because the harassment was at the hands of the Plaintiffs' supervisors. Additionally, the County had an affirmative duty to act to prevent workplace discriminatory/harassing conduct and to properly respond to employee claims of workplace discrimination/harassment when they arise. The County did neither. While it had written policies in place to address discrimination/harassment, it took no steps to enforce such policies. There were no actions taken to prevent the conduct of Willis and/or Wirskye and when the conduct was reported and/or known and/or should have been known, there were no steps taken to address it. In fact, when Pickrell, her Deputy Chief Henslee and Jane Doe 1 went to HR to complain specifically about Defendant

Willis, their concerns were dismissed and they were told that there was nothing that could be done. There were six anonymous letters to Defendant Commissioners and Collin County Human Resources detailing the conduct of both Defendant Willis and Defendant Wirskye and yet there was no action taken by the County to address the problem or help the affected women.

120. Should it be determined that Defendant Willis was not an employee of the County sufficiently to impose liability under Title VII and/or the Texas Labor Code, the Fifth Circuit recognizes that employers may be liable under Title VII for the conduct of non-employees in the workplace when the employer knows of the harassment but fails to act. *Frank v. Harris Cnty.*, 118 F. App'x 799, 803 (5th Cir. 2004), citing *Garziano v. E.I. Du Pont De Nemours & Co.*, 818 F.2d 380, 387 (5th Cir.1987). It is clear that Collin County Commissioners and HR personnel knew of the harassment/discrimination/retaliation and failed to act on that knowledge.

### 2. Gender Discrimination

121. Collin County is liable for the workplace gender discrimination by both Defendant Willis and Defendant Wirskye in their roles as District Attorney and First Assistant District Attorney. They treated the female employees very differently than the male employees, including, but not limited to, the use of pejorative terms against women as "bitches," "whores" and "sluts." The women were publicly humiliated in meetings and instructed they were not allowed to wear pants. The continuing harassment was related specifically to gender. Defendant Willis treated the women differently than the men based on gender, including physical touching, required one on one "role play" in his office and berating them when his advances were rejected. Defendant Wirskye treated the women differently than the men, including using pejorative names, public humiliation in meetings, degrading comments, and excluding them from activities that were "guys only" for the benefit of the male Assistant District Attorneys. Women were

passed over for promotion in favor of men, particularly if they did not engage in the good ole boy environment created by Defendant Wirskye. Particularly, Ms. LaFleur was singled out based on gender, treated differently than male prosecutors, called a "whore," had her wardrobe scrutinized, was passed over for promotion, was harassed based on her gender and constructively discharged.

### 3. Retaliation

**122.** Plaintiffs sue Collin County for retaliation against Plaintiffs for good faith reporting and/or opposing unlawful harassment and/or discrimination under Title VII and Tex. Lab Code § 21.055.

#### a. Kim Pickrell

**123.** Chief Kim Pickrell supervised more employees than Defendant Wirskye himself before he demoted her. She did so while being burdened with the weight and repetitiveness of Defendant Willis' sexual harassment. For years, Chief Pickrell was required to endure sexual harassment from Defendant Willis as a condition of her rank as his Chief Investigator. When Chief Pickrell finally made a good faith report of unlawful harassment and discrimination to Human Resources, she was punished by Defendant Wirskye and Human Resources and made to report to a person (Wirskye) who she knew to be vindictive and emotionally abusive to several of her co-workers. Because Chief Pickrell exercised her right to seek help, she suffered retaliation and was stripped of the majority of her duties, as well as humiliated and disparaged among her subordinates and the Chief Prosecutors. Her file has been tainted with derogatory characterizations of her that were fabricated by one or some of the Defendants, as part of their vendetta against her for having reported details of Defendant Willis' misconduct to Human Resources. Chief Pickrell is a highly capable career law enforcement professional who is eligible to retire in less than 2 years, but has been forced by Defendants to finish out her service to the

taxpayers of Collin County in a toxic and abusive work environment for the remainder of that time, if she is not terminated for her whistleblowing. She is capable of working far past her retirement eligibility.

### b. Keith Henslee

124.  Deputy Chief Henslee is also a career law enforcement professional, having served nearly a decade in the Denison Police Department before joining the Collin County District Attorney's Office. He is a United States Navy veteran of the Persian Gulf War. After working his way through the ranks, he enjoyed a supervisory position as the Deputy Chief Investigator at the District Attorney's Office. Deputy Chief Henslee followed procedures mandated by both the Collin County Handbook and the District Attorney's Policy manual and reported sexual harassment and a hostile work environment to Human Resources. Although the law and his employer purported to protect him for reporting Defendant Willis' unlawful conduct, Defendant Willis and Defendant Wirskye punished him for making a good faith report of unlawful harassment/discrimination by stripping him of his duties and demoting him to a regular felony trial court. As part of this retaliatory demotion, he was made to work in a court alongside the investigators he had very competently supervised for years.

### c. Jane Doe 1

125.  Defendant Willis harassed and retaliated against Jane Doe 1 for declining Defendant Willis' repeated unwelcomed sexual advances toward her.  Defendant Willis harassed and retaliated against Jane Doe I's rebuffing of his advances by beginning a pattern of insults and humiliation, including telling her that she thinks like a child and shall therefore be treated as one, as well as requiring her to be silent and isolated during meetings, as her input on work-related matters was of no importance to him.

#### d. Fallon LaFleur

**126.** Fallon LaFleur was clear in her objections to, and resistance to, Wirskye's "boy's club" approach to the Assistant District Attorneys. She refused to participate in the after-hours drinking. She objected to the exclusion of women from out of town events. She reported both Wirskye and Wills to Human Resources for their inappropriate conduct. Her opposition to the blatant gender discrimination and sexual harassment of women Assistant District Attorneys was so apparent to Wirskye, that he concluded that Ms. LaFleur was the author of one of the anonymous letters complaining of his conduct and he began to retaliate against her directly, accusing her in front of a group of authoring the letter, mocking her, and belittling her publicly, resulting in her constructive discharge. After she left the DA's office, one of her ways to earn a living was conducting a probationer class. Wirskye directed all of the Assistant DA's to refuse to accept for credit the classes that she conducted.

#### 4. Aiding and Abetting

**127.** Tex. Lab Code § 21.056 provides a cause of action against an employer that "aids, abets, incites, or coerces a person to engage in a discriminatory practice." It is clear in this case that Collin County aided and abetted both Defendant Willis and Defendant Wirskye to sexually harass, discriminate and retaliate against the Plaintiffs in this case. There were multiple reports to Human Resources as well as Collin County's governing body, the County Commissioners relating to the discrimination, harassment and retaliation. These reports were made by Collin County employees—Kim Pickrell, Keith Henslee, Fallon LaFleur, numerous anonymous letters over approximately two years with specific details of sexual and gender harassment, discrimination, retaliation and abuse, identifying the wrongdoers and nothing was done to address it, knowingly and intentionally allowing it to continue unabated. The conduct of Collin County,

through its Commissioners and HR personnel, assisted and encouraged Willis and Wirskye to continue their illegal actions against Collin County employees.

## B.  Individual Liability Under § 1983

**128.**  The County violated the Fourteenth Amendment's guarantee of equal protection from sexual harassment. *See Southard v. Tex. Bd. of Criminal Justice,* 114 F.3d 539, 550 (5th Cir. 1997) (noting that sexual harassment in public employment violates the Equal Protection Clause and that circuit courts have allowed plaintiffs to assert such claims under both Title VII and § 1983) (citations omitted).

### 1.  Liability

**129.**  Plaintiffs sue the Individual Defendants for their conduct as described in this lawsuit, including the violation of the Plaintiffs' constitutional rights under the Fourteenth Amendment's guarantee of equal protection.  The conduct of Defendants is analyzed using the same analysis applied to Title VII and the provisions set forth in section A above apply equally and are incorporated by reference.

### 2.  No Qualified Immunity

**130.**  Plaintiffs  may defeat qualified immunity by showing (1) that the official violated a statutory or constitutional right and (2) that the asserted right was "clearly established" at the time of the challenged conduct. *Cloud v. Stone*, 993 F.3d 379, 383 (5th Cir. 2021).  As stated, the conduct of Defendants violated Plaintiffs' rights under the Equal Protection clause of the Fourteenth Amendment.  It has been established since at least 1997 that misconduct such as that on the part of Defendants violated individual constitutional rights.  *See Southard v. Tex. Bd. of Criminal Justice,* 114 F.3d 539, 550 (5th Cir. 1997) (noting that sexual harassment in public employment violates the Equal Protection Clause).  The conduct of all Defendants was

objectively unreasonable under the circumstances. Defendant Willis engaged in repeated and ongoing sexual harassment and discrimination as well as retaliation, as described herein. Defendant Wirskye engaged in repeated and ongoing sexual harassment and discrimination as well as retaliation, as described herein. The individual Commissioners were aware of the discrimination, harassment and retaliation and were deliberately indifferent to the constitutional violations that they had a duty to address. Despite being directly notified of the ongoing constitutional violations, the Commissioners refused to take any action and allowed the conduct to continue.

### C.   County Liability Under § 1983

**131.**   Greg Willis, Chris Hill, Darrell Hale, Susan Fletcher, Cheryl Williams and Duncan Webb acted as policymakers for Collin County under these circumstances. When determining whether a DA is acting for the county or for the state, Fifth Circuit precedent clearly distinguishes a district attorney's "prosecutorial" duties—which are conducted on behalf of the state—from those duties that are "administrative or managerial in nature"—which are conducted on behalf of the county. *See Esteves v. Brock,* 106 F.3d 674, 678 (5th Cir. 1997). In this case, the conduct of Defendant Willis at issue is unrelated to prosecutorial duties and is purely "administrative." As the Collin County DA, Defendant Willis has the hiring, firing and assignment authority with respect to Assistant District Attorneys and personnel in the DA's office. Defendant Willis abused this authority by unlawfully harassing the Plaintiffs and other women on the basis of sex, discriminating against Plaintiffs and other women on the basis of sex, allowing his First Assistant to harass and discriminate on the basis of sex, and using his position to retaliate against those who opposed or reported such conduct. Because the policymaker is the wrongdoer, the County is liable without the requirement of establishing a formal policy or a pattern of similar wrongful

conduct.

**132.** The Commissioners Court is also a policymaker for Collin County with respect to personnel policy for the County in general and the functioning of Human Resources with respect to preventing or addressing unlawful harassment, discrimination and retaliation in the workplace. The County Commissioners had direct involvement in abetting and allowing Willis and Wirskye to harass, intimidate, discriminate, abuse and retaliate against the Plaintiffs and others. There were numerous reports, even pleas, to the County Commissioners to take action and stop the abuse and such pleas were intentionally and knowingly ignored. The Defendant Commissioners were deliberately indifferent to the conduct of the wrongdoers and the plight of their victims.

**133.** Alternatively, should the Court require a *Monell* analysis, the facts establish a widespread pattern or practice of conduct that was known to the Commissioners as policymakers and allowed to continue. The policies, practices, and/or customs of the County constituted moving forces of the unconstitutional conduct that proximately caused damages to the Plaintiffs. The County failed to prevent or address the ongoing unlawful harassment, discrimination or retaliation of which they were on notice and failed to implement effective procedures governing how such conduct on the part of elected officials, including the District Attorney, would be addressed. All of these customs and practices were the moving force of the constitutional violations that resulted in harm to the Plaintiffs.

### D. 42 U.S.C. § 1985(2)

**134.** If two or more persons in any State or Territory conspire to deter, by force, intimidation or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his having so attended or testified,

or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;[3] [4]

**135.** Section 1985, in pertinent part, prohibits conspiracies either to deter, by force, threat, or intimidation, any party or witness from attending or testifying freely, fully, and truthfully in a federal court or to injure any party or witness in his person or property because he attended or testified in federal court. See 42 U.S.C. 1985(2) (clause i).[1] The statute provides a remedy in damages to anyone who is injured in his person or property or deprived of a federal right or privilege as a result of an act in furtherance of a conspiracy prohibited under any part of Section 1985, including clause one of Section 1985(2). See 42 U.S.C. 1985(3) (clause iii).[5]

**136.** If a Collin County District Attorney's Office employee makes a report of a violation of their constitutional rights to HR, the natural progression is that the next step is filing a complaint to the Equal Employment Opportunity Commission (EEOC). The EEOC is the administrative agency charged with enforcing the laws of Title VII. The step that follows an EEOC investigation is a "Right to Sue" letter, meaning that the EEOC is a necessary step in the path to federal court. Thus, the Defendants conspired to keep County employees from going to

---

[3] https://www.law.cornell.edu/uscode/text/42/1985
[4] Bradt v. Smith, 634 F.2d 796, 1981 U.S. App. LEXIS 20907
[5] https://www.justice.gov/osg/brief/haddle-v-garrison-amicus-merits

court.

**137.** Collin County's motive in silencing those who have reported violations that occur inside the DA's Office is not only to relieve themselves of the effort it takes to solve a problem, but also to keep the complainants away from the EEOC. If the complainants believe that there is no recourse for them because "the DA is Untouchable", it follows that they will also not follow their rights up the administrative chain through the EEOC and then to federal court. The motive of the County, the DA and the First Assistant is to avoid liability in the court system. They not only do not want to be discovered by the public to be the abusers that they are, but they want to avoid facing the damage they caused through their discriminatory actions and accountability in a public forum. Each of these actors conspired to prevent employees of the District Attorney's Office from exercising their right to seek redress for violations of Title VII, and also depriving the complainants of due process. "The DA is Untouchable" means that NO ONE can hold the DA accountable, not even the court system. The Defendants silence the employees who speak up – they intimidate them from seeking counsel to challenge the invidious animus put forward by HR.

**138.** Claims brought under Section 1985(2) do not require invidious motive. Lack of invidious motive is an inadequate basis for dismissing a claim under the first clause of § 1985(2), because that clause "contain[s] no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws." *Kush v. Rutledge*, 460 U.S. 719, 725, 103 S. Ct. 1483, 75 L. Ed. 2d 413 (1983)[6]

**139.** Despite the fact that 1985(2) does not require invidious motive, invidious motive exists in the form of a class-based animus. Class Based Animus is clear – women are not safe as

---

[6] *Kush v. Rutledge*, 460 U.S. 719, 725, 103 S. Ct. 1483, 75 L. Ed. 2d 413 (1983)

employees of the District Attorney's Office. Women are a protected class, a fact which Defendant Willis angrily conceded to VyKim Le as the reason he has not yet fired Chief Pickrell for reporting his abuses to Human Resources. If the DA is not sexually harassing female employees through touching, unwanted sexual hugs, overtures, moaning or inviting a woman up to his room, his First Assistant is berating them, calling them pejorative names, and openly disparaging them for the simple fact that they are female including stating "[o]pening statements are not like fucking a woman, there's no need for foreplay;" "[g]et wet and stay wet;" and "hot ass prosecutors" who are "fuckable." These are part of the class-based animus. These statements should never be permitted in any workplace, much less the one lawyer's office that has a duty to see that justice is done above all else.

**140.** While § 1985(2) requires that the conspiracy be aimed at preventing an injured party from testifying in court, that could perhaps be foreclosed when the facts point to an administrative agency such as the EEOC. To this point, Title VII was not the only cause of action available to the plaintiffs in this action. 42 U.S.C. 1983 was also available, and it does not require a Right to Sue Letter from the EEOC. The plaintiffs could prevail on 1983 claims based on the facts presented, and certainly the defendants intended to silence them from that avenue.

E.  42 U.S.C. § 1985(3)

**141.** The Defendants in this case are also liable under 42 U.S.C. § 1985(3), which does require an invidious discriminatory intent by the state actor. The animus requirement is comprised of two analytically distinct inquiries: (1) whether there is a "qualifying class" and (2) whether the

defendant was motivated by discriminatory animus **against the class.** *Id.* at 269.[7] The second inquiry requires a defendant to have been "motivated by a purpose (malevolent *or* benign) directed specifically at [the qualifying class]" by reason of the essential characteristic of that class.

142.  The essential characteristic of the class in this lawsuit is that the class is female. Females in the district attorney's office assume positions of power traditionally held by men. Chief Pickrell, for example, is the top Investigator in the DA's Office. To allow a woman to enjoy that role under equal protection would have been too far of a leap for the DA, his First Assistant and Collin County Government. She had to not only tolerate sexual harassment as *quid pro quo* for her Chief position, she had to be consistently reminded that her looks made her an object of desire and ultimately, she was not equal to her male peers.

143.  Defendant Wirskye has significant animus towards women. This Complaint is replete with examples of his lodging hateful and demeaning, disrespectful, misogynistic slurs that can only be meant to hurt, degrade and harass female attorneys and female employees. His animus is meant to not only humble the female lawyers under his purview, but also to both personally and publicly humiliate and destroy them. He intentionally breaks them down because that is his method of exerting power and control.

144.  The Defendants' invidious discriminatory animus preys upon the fear of disclosure inherent in female victims of abuse. The data is clear that women are far more likely to be victims of physical/emotional/sexual abuse than men. The Defendants take advantage of the fear of disclosure, and they gamble that the victims will remain silent. They prey upon the female

---

[7] Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 113 S. Ct. 753, 122 L. Ed. 2d 34, 1993 U.S. LEXIS 833, 61 U.S.L.W. 4080, 93 Cal. Daily Op. Service 258, 93 Daily Journal DAR 583

attorney's desire to be equal to their male counterparts and treat them worse because they know that they're less likely to outcry because it would make them look weak. They prey upon the female attorney's fear of being judged – of being less than a male DA. They know that for a female ADA or LEO to report sexual harassment is jeopardize their career. They know that these women would rather suffer than to appear weak or "look like a victim." All of these Defendants want to keep their jobs. Some of them have to win elections to do so, thus invidious discriminatory motive exists in order to conceal their abusive conduct from voters, taxpayers, and press.

**145.** Section 1985(3) requires acts in furtherance of the conspiracy. To that end, Defendants Willis, Wirskye and a Chief "shook down" Ms. Le on May 28. Then, the DA attempted to influence her testimony by gaslighting her into believing "he never touched anyone" when he knew full well that he had impermissibly touched Ms. Le himself. After the Anonymous Letters came out, Defendant Wirskye said that he "told the DA to stop having closed-door one-on-one meetings with female employees." Wirskye said that to Chief Pickrell and Deputy Chief Henslee. Defendant Hill conspired with Defendant Willis on April 8th, which triggered subsequent retaliatory actions in the days that immediately followed. Prior to this meeting, Defendant Wirskye was superficially apologetic to Chief Pickrell and Deputy Chief Henslee about what they were going through. After Defendant Hill's visit, the retaliation by Defendant Wirskye was visible. Collin County HR was also complicit. The Collin County Handbook states that reports to HR about sexual harassment are kept confidential. In this instance, Defendants Willis and Wirskye had knowledge of the names of potential victims that Chief Pickrell provided to HR, proving that HR did not keep the report confidential; rather, they informed their co-defendant and the co-defendant attempted to silence Ms. Le. That act was in furtherance of the conspiracy to silence female employees from telling the truth about the DA's Office, because that

would not have been consistent with the core belief that "the DA is untouchable." Finally, in a subsequent meeting once the retaliation began, Defendant Wirskye said to Chief Pickrell and Deputy Chief Henslee to "[g]et out of your head and quit playing victim," a statement made in an act to further the conspiracy.

### F. 42 U.S.C. 1986

**146.** "Section 1986 imposes liability on every person who knows of an impending violation of section 1985 but neglects or refuses to prevent the violation." *Karim- Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 626 (9th Cir. 1988). Absent a valid claim for relief under section 1985, there is no cause of action under 1986. *Trerice v. Pedersen,* 769 F.2d 1398, 1403 (9th Cir. 1985).

**147.** This claim is evidenced through the exit interviews that have been provided to HR over the years. According to Ms. LaFleur, at least 10 reports of harassment/abuse had been made to HR during Defendant Willis' tenure. Additionally, the Anonymous Letters put the County on notice of the violations, including the commissioners court. Defendant Susan Fletcher herself acknowledges the Anonymous Letters but disregards the County's duty to investigate pursuant to their own policy manual. Defendant Fletcher, rather, is deliberately indifferent to her obligation and shames those who so bravely exercised their voice, even if anonymously. None of the Commissioner Defendants put forward any agenda item at Commissioners Court or recommended hiring an independent unbiased investigator to look into the claims asserted through the anonymous letters. Their continuing deliberate indifference in the face of known misconduct continued to put the women employees of the DA's office in harm's way.

**148.** The Defendants knew they were violating each Plaintiff's rights and dared anyone one to stop them. It was precisely in this context that Defendant Wirskye told Keith Henslee that he didn't "give a fuck" if the Plaintiffs reported Defendant Willis' misconduct to HR because the DA was "untouchable." Sadly, Mr. Wirskye had good reason to believe that Defendant Willis was "untouchable," as HR had told several of the Plaintiffs the same thing. While it is true that Defendant Willis was independently elected by the voters, the Commissioner's Court and the Human Resources Department had the power and legal duties at all relevant times to investigate, discover, and stem the ongoing abuse that Defendants were inflicting upon Plaintiffs and others. At all relevant times, the Commissioners had the power and legal duties to fire, demote, reassign, and/or reprimand Defendant Wirskye for his hostile and discriminatory work practices. In flagrant dereliction of its duties, Collin County chose to look the other way to further empower the abusers over its own employees, the abused. The Commissioners' and Human Resources' complicity in the misconduct of Defendants Willis and Wirskye emboldened those men to believe that although they had sworn to uphold the law, they were above it. That time is over. No one is above the law, as this case will again demonstrate.

## VI. DAMAGES

**149.** Plaintiff Kim Pickrell sustained damages including future pecuniary losses including future wage loss, loss of wage earning capacity, damage to her professional reputation in the community and ability to further her career, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses for which she is entitled to recovery under these causes of action.

**150.** Plaintiff Keith Henslee sustained damages including future pecuniary losses including future wage loss, loss of earning capacity, damage to his professional reputation in the community and ability to further his career, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses for which he is entitled to recovery under these causes of action.

**151.** Plaintiff Fallon LeFleur sustained damages including lost wages and benefits, future pecuniary losses including future wage loss, loss of earning capacity, damage to her professional reputation in the community and ability to further her career, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses for which she is entitled to recovery under these causes of action.

**152.** Plaintiff Vykim Le sustained damages including future pecuniary losses including future wage loss, damage to her professional reputation in the community and ability to further her career, loss of earning capacity, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses for which she is entitled to recovery under these causes of action.

**153.** Plaintiff Jane Doe 1 sustained damages, including lost wages and benefits, future pecuniary losses including future wage loss, loss of earning capacity, damage to her professional reputation in the community and ability to further her career, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses for which she is entitled to recovery under these causes of action.

**154.** Plaintiff Jane Doe 2 sustained damages, including lost wages and benefits, future pecuniary losses including future wage loss, loss of earning capacity, damage to her professional reputation in the community and ability to further her career, emotional pain, suffering,

inconvenience, mental anguish, loss of enjoyment of life and other nonpecuniary losses for which she is entitled to recovery under these causes of action.

**155.** Plaintiffs individually and in the aggregate are also entitled to declaratory relief that a violation has occurred to each individually. Plaintiffs are also entitled to equitable relief in the form of an injunction against future discrimination or retaliation individually and in the aggregate.

**156.** Plaintiffs are entitled to attorneys' fees, interest on judgment, and costs of Court for services rendered in seeking justice in this cause including the trial and appeals.

**157.** Plaintiffs are also entitled to receive punitive damages because Defendants, individually and as an aggregate engaged in harassing, discriminatory and/or retaliatory practices as well as engaged in harassing, discriminatory and/or retaliatory practices with malice or reckless indifference to the federally protected rights of these aggrieved individuals.

## JURY DEMAND

**158.** Plaintiffs request a trial by jury to the extent allowed by the law.

## CONCLUSION

Wherefore, Plaintiffs Kim Pickrell, Keith Henslee, Fallon Lefleur, Vykim Le, Jane Doe 1, and Jane Doe 2 request that Defendants Collin County, Texas, Greg Willis, Individually, Bill Wirskye, Individually, Darrell Hale, Individually, Susan Fletcher, Individually, Chris Hill, Individually, Cheryl Williams, Individually, and Duncan Webb, Individually answer and that on final trial, Plaintiffs have judgement against Defendants for compensatory, declaratory, equitable, and exemplary damages, attorneys' fees, expert fees, costs of Court and suit, and interested as provided by law, and to any other further affirmative relief to which they may be so entitled.

SIMON GREENSTONE PANATIER, P.C.


*/s/  Jeffrey B. Simon*
JEFFREY B. SIMON
State Bar No. 00788420
jsimon@sgptrial.com
CHARLES E. SOECHTING, JR.
State Bar No. 24044333
csoechting@sgptrial.com
JODEE L. NEIL
State Bar No. 24039848

jneil@sgptrial.com
1201 Elm Street, Suite 3400
Dallas, Texas 75270
Telephone:  (214) 276-7680
Facsimile:  (214) 276-7699


and

*/s/ Susan E. Hutchison*
Susan E. Hutchison
State Bar No. 10354100
sehservice@FightsforRight.com

S. Rafe Foreman
State Bar No. 07255200
srfservice@FightsforRight.com

HUTCHISON & FOREMAN, PLLC
500 East 4th St., Ste. 100
Fort Worth, Texas 76102
(817) 336-5533
(817) 887.5471

**ATTORNEYS FOR PLAINTIFFS**